GABRIEL VEGA, an Infant, by His Mother and Natural Guardian, FLORENTINA MELENDEZ, et al., Appellants, v S.S.A. PROPERTIES, INC., et al., Defendants, and JADEEM GENERAL CONTRACTORS et al., Respondents. [788 NYS2d 28]—

Order, Supreme Court, New York County (Faviola A. Soto, J.), entered September 5, 2003, which granted defendant Jadeem General Contractors' motion for summary judgment, and denied plaintiffs' cross motion for summary judgment on liability, unanimously modified, on the law, defendant's motion denied, the complaint reinstated, and otherwise affirmed, without costs. Order, same court and Justice, entered November 24, 2003, which granted defendant City of New York's motion for summary judgment dismissing the complaint against it, unanimously reversed, on the law, without costs, defendant's motion denied, and the complaint as against this defendant reinstated.

Plaintiffs brought this action to recover for lead poisoning suffered by the infant plaintiff, Gabriel Vega, as a result of exposure to toxic levels of lead in his apartment at 556 West

126th Street. Gabriel and his family had moved to the apartment shortly after his birth in 1980. In October 1982, he was diagnosed with lead poisoning after tests revealed a blood lead level (PbB) of 40 ug/dl.[1]

On October 26, 1982, the New York City Department of Health (DOH) inspected the apartment, and it issued an order to the owner, S.S.A. Properties, Inc. (SSA Properties), to abate the lead condition. When SSA Properties failed to act, DOH sent an emergency repair order to defendant City of New York. Defendant Jadeem General Contractors (Jadeem) was hired to perform the lead abatement project, and worked at the apartment between January 13, 1983 and January 18, 1983. DOH reinspected the property on February 22, 1983 and certified that all violations had been corrected. However, as of October 1983, Gabriel still had an elevated blood lead level of 15 ug/dl.

Plaintiffs brought this action against a number of defendants,[2] including the City and Jadeem. As relevant, the complaint alleged that Jadeem failed to properly eliminate the toxins from the apartment, exposing Gabriel to high levels of lead dust, exacerbating his existing condition. Jadeem thereafter moved for summary judgment dismissing the complaint, and plaintiffs cross-moved for partial summary judgment as to liability.

In support of its motion, Jadeem argued that its duties were expressly limited under the contract with the City. Jadeem also maintained that there was no evidence that the infant plaintiff suffered any additional injuries because of its work at the apartment. Jadeem asserted that Gabriel's blood lead level decreased following the repairs, and it argued that any link between Gabriel's lead poisoning and its repair work was speculative.

Plaintiffs cross-moved for partial summary judgment, arguing that Jadeem's lead abatement operations were conducted negligently, exposing Gabriel to dangerous fumes, dust and vapors. Plaintiffs' motion was supported by the affidavits of Florentino Vega (Gabriel's father), Martin Rutstein, Ph.D., and John F. Rosen, M.D., and a report by Theodore Lidsky, Ph.D. Plaintiffs also submitted the deposition testimony of a DOH employee. He confirmed that lead abatement should be conducted one room at a time, and that protective plastic coverings

---

1. 40 ug/dl means 40 micrograms of lead per deciliter of blood (*see Campbell v Metropolitan Prop. & Cas. Ins. Co.* (239 F3d 179 [2d Cir 2001] [for an extensive discussion of lead poisoning]).

2. The other captioned defendants, with the exception of Arthur Bailey, either defaulted or were never served. The estate of Mr. Bailey, the former managing agent of the building, settled with plaintiffs and the action was discontinued as to him.

should be used to prevent dust escaping from the work area. In addition, plaintiffs submitted portions of the deposition testimony of one of Jadeem's workers. He admitted that Jadeem does not provide its employees with any training in lead abatement; that a family is allowed to stay in the apartment as the Jadeem employees are working; and that the workers may have closed doors on occasion, but they did not regularly secure areas to confine contamination. Mr. Vega's affidavit described Jadeem's lead abatement work as follows: "They immediately broke all the walls and the ceilings . . . with crowbars and they made a terrible mess with the paint, plaster and all the debris, and there was dust that spread into and all over the apartment. My wife and I were home at the time the work was done and so was Gabriel (he was only 2½ years old at the time) . . . They left [interior doors and curtains] open when they worked, spreading dust all over . . . Neither the workers nor anyone else ever told us that we should leave the apartment while the work was going on." Mr. Vega described dust "all over the apartment and on our clothing and on the floor, the furniture, the television, the stereo, the curtains, the children's toys, and everything else in the apartment" while Jadeem worked at the apartment. He also recounted that, "[a]t one point, I looked at the baby, and he was all white like a ghost from all the dust, and we had to wash him, but he got dusty again."

Dr. Rutstein, plaintiffs' expert on environmental hazards, reviewed Mr. Vega's affidavit, Gabriel's DOH records, Dr. Rosen's affidavit, and records supplied by Jadeem. He concluded that: "attempts at abatement by Jadeem were carried out improperly and in violation of existing regulation; that the environmental remediation techniques employed by Jadeem were patently inadequate to protect Gabriel Vega from excess exposure while such work was ongoing; that these techniques constituted a deviation from then existing reasonable standards of lead abatement; and that these actions created a lead hazard in addition to and separate from that of the already degraded lead based paint surfaces that had been identified by the department of health."

Dr. Rosen, a board certified pediatrician who has treated or supervised the treatment of over 25,000 lead-poisoned children, submitted an affidavit on plaintiffs' behalf, stating that he reviewed the various records, the affidavit of Mr. Vega, and he performed a physical examination of the child. This expert opined that: "It is reasonably scientifically certain that Gabriel was exposed during the abatement process to excessive levels of lead dust. Indeed, given the pervasive nature of the dust condi-

tion in the apartment as described in detail by Mr. Vega, it would have been impossible for Gabriel to escape exposure to this toxic dust and resultant bodily injury . . . *Once the lead has entered the bloodstream of a child such as Gabriel, the lead invades the child's bone marrow and inhibits the production of heme, which is the red substance which coats red blood cells and upon which we are all dependant for the provision of oxygen and for removal of waste products from body tissues. There is no question that even at low levels, exposure to lead, which is a heavy metal that is of no use to humans, causes this type of injury, and given the pervasive dust conditions as described by Mr. Vega and the prior uncontested DOH finding of lead contamination at the premises, coupled with Gabriel's diagnosed elevated lead levels, I can state with a reasonable degree of medical and scientific certainty that in this case Gabriel suffered toxic injuries to his red blood cells and other heme related proteins throughout every organ of his body, including the brain, during the time that the abatement was ongoing and as a direct consequence thereof*" (emphasis supplied).

Dr. Lidsky, a psychologist specializing in disabilities resulting from neurotoxicology, also submitted an affidavit on plaintiffs' behalf. He stated that he had examined Gabriel, reviewed his medical and academic records, and opined that this plaintiff had suffered brain injury, manifested by cognitive and motor impairment, from exposure to lead.

In opposition and reply, Jadeem first argued that there were issues of fact as to whether it performed the abatement project negligently. It asserted that there was no evidence of a quantifiable exacerbation of Gabriel's injuries proximately caused by its six days of work at the apartment. Jadeem submitted the unsworn report of Dr. Carmen Vasquez, a clinical psychologist, who examined Gabriel at age 21. He concluded that: "Because of multiple confounding factors, it is impossible to determine with scientific certainty the degree to which the lead exposure accounts for [Gabriel's] current weaknesses." Jadeem also submitted the affidavit of Dr. Howard Sandler, an expert in the field of occupational and environmental medicine. He reviewed the prior submissions and opined, "Gabriel Vega did not sustain any additional injury during or subsequent to Jadeem's repair work in the subject apartment." Dr. Sandler also opined that Dr. Rosen's opinion was not based upon sound scientific methodology.

In reply, plaintiffs pointed out that Dr. Sandler had not challenged Dr. Rosen's detailed explanations as to the metabolic pathway of lead. Plaintiffs also noted that Gabriel still had an elevated blood lead level 10 months after the abatement project.

In the first order appealed, the IAS court granted Jadeem's motion for summary judgment, stating that plaintiffs had not established injury to Gabriel as a result of Jadeem's lead abatement project. The City then moved for summary judgment, under the doctrine of law of the case, arguing since the court found that Jadeem's abatement work did not constitute actionable negligence, no liability lay against it for negligently hiring Jadeem. In the second order appealed, the IAS court granted the City's motion. We reinstate the complaint against both defendants.

Ordinarily, "a contractual obligation, standing alone, will generally not give rise to tort liability in favor of . . . third part[ies]" (*Espinal v Melville Snow Contrs.*, 98 NY2d 136, 138 [2002]). However, there are exceptions to this rule. An independent contractor can be "subject to tort liability for failing to exercise due care in the execution of the contract" (*Church v Callanan Indus.*, 99 NY2d 104, 111 [2002]) if it fails "to exercise reasonable care in the performance of his duties, [and thereby] 'launche[s] a force or instrument of harm'" (*Espinal, supra* at 140, quoting *H.R. Moch Co. v Rensselaer Water Co.*, 247 NY 160, 168 [1928]). That exception is applicable here. The record shows that Jadeem may have performed its work in a manner which created extensive lead dust and debris, exposing plaintiffs to a dangerous, toxic environment.

However, the sharply contrasting expert opinions as to whether the infant's exposure to lead during the abatement project contributed to or exacerbated his injuries prevents the grant of summary judgment to any party. They raise issues of fact and questions of credibility which the jury must resolve (*see Bradley v Soundview Healthcenter*, 4 AD3d 194 [2004]; *Munoz v Mael Equities Inc.*, 2 AD3d 118 [2003]).

As we have reinstated the complaint against defendant Jadeem, we also vacate the order granting the City summary judgment and reinstate the complaint against that defendant (*see Jewett Homes v Ciardiello*, 39 AD2d 581 [1972]). This is without prejudice to the right of the City to raise substantive claims as to its liability. Concur—Nardelli, J.P., Mazzarelli, Lerner, Friedman and Marlow, JJ.