OPINION OF THE COURT
Paul A. Victor, J.
Relief Sought
In this complex lead paint case brought on behalf of three infant plaintiffs, defendant LSL Services, Inc. and defendant City of New York each move for summary judgment pursuant to CPLR 3212 dismissing the complaint. Plaintiffs cross-move for an order deeming six notices of claim previously served on the City to be timely nunc pro tunc.
The motions and cross motion are consolidated for disposition and decided as follows.
An Unsettled Issue?
One of the issues presented herein appears to be quite controversial and is apparently novel. Is a lead paint claim actionable when the reported blood lead level (i.e., 6 pg/dh) is less than what is considered by the Centers for Disease Control (CDC) to be the threshold for “normal”? According to the CDC, a child must have a blood level of 10 pg/dh or more to be considered eligible for monitoring. The issue is unsettled, especially in the context of the circumstances now presented.
Facts and Legal Arguments of Parties
This action was commenced on behalf of three infants who allegedly sustained lead poisoning at three separate residences— *371 1530 Bryant Avenue, owned by defendant City; 51 West 119th, owned by defaulting defendant Annie Nebblett; and 2730 Decatur Avenue, owned by defendant LSL.
According to the plaintiffs, in 1987, Eribel Peri, the plaintiffs’ mother, emigrated from Honduras and moved into her sister’s one-bedroom apartment, owned by defendant City, at 1530 Bryant Avenue, Bronx, New York.
While living at the City apartment, Eribel had her first son, Victor Peri, on January 20, 1988 at Lincoln Hospital. During this time, Victor received several lead screenings during routine medical checkups and during WIC program checkups at Lincoln Hospital. He was never diagnosed with an elevated blood lead level while living at the City apartment. Harvey Arzu was born March 18, 1989 at Lincoln Hospital, and lived at the City building for the first two years of his life. During that time he also received regular medical checkups at Lincoln Hospital. Harvey was never diagnosed with medical problems of any kind and, although it is unclear as to whether he was screened for lead, there is no indication in the record that he had any elevated blood lead levels or any symptoms consistent with lead exposure.
Eribel Peri remained at the City apartment until May 1991. On or about May 5, 1991, she moved with her two children to a one-bedroom apartment at 51 West 119th Street, New York, New York, owned by defendant Nebblett and managed by a court-appointed 7A Administrator. On October 8, 1991, Victor was diagnosed with an elevated blood lead level of 26 (or 43) µg/dL.[1] Because of Victor’s elevated blood lead diagnosis, the Department of Housing (DOH) inspected the Nebblett premises on October 17, 1991. Peeling paint was found, along with 22 lead violations. On October 24, the Department of Housing issued an order to abate to the 7A Administrator.
In 1992, plaintiffs moved to 2730 Decatur Avenue owned by defendant LSL. While living at the LSL apartment, Harvey Arzu (and/or someone known as “Horug Arzo”) was diagnosed with an elevated blood lead level of 18 pg/dL on July 14, 1993.[2] On September 14, 1993, Environmental Management Systems, Inc. inspected the LSL apartment for the presence of lead. The *372 report shows that there was lead present, and that children were living in the apartment at the time of the inspection. During this period Victor’s blood level was reduced to 6 yug/dL as determined by a test conducted on September 2, 1992. Eribel Peri returned to the City apartment with her three children in October 1993 and resided there until December 1995. The blood levels of the three children for all four periods of occupancy are summarized on the following time-line chart as follows:
Time-Line Chart
1987 to May 1991 — (1530 Bryant Avenue [defendant City])
(1) Victor Peri (born Jan. 20, 1988)
Medical exams on January 25, 1989 and June 12, 1989 and during 1990 atLincoln
Hospital for Victor Peri indicate no lead poisoning.
(2) Harvey Arzu (born Mar. 18, 1989)
Regular medical checkups and no abnormal lead levels noted.
May 1991 to April 1992 — (51 West 119th Street [defendant Nebblett])
(1) Victor Peri
Lead level 26 or 43 yug/dL on October 8, 1991, 24 yug/dL on October 24, 1991,
and lead level 13 /xg/dL on February 25, 1992
(2) Harvey Arzu
Regular medical checkups and no abnormal lead levels noted.
April 1992 to October 1993 — (2730 Decatur [defendant LSL])
(1) Victor Peri
Lead level 6 yug/dL on September 2, 1992
(2) Harvey Arzu and/or “Horug Arzo”
Lead level 18 yug/dL on July 14, 1993[3]
(3) Jose Peri (born July 7, 1992)
Zinc protoporphyrin level (zpp) <34 yug/dL on March 5, 1993[4]
Blood lead level test conducted on July 14, 1993 but report does not disclose the lead level.
*373 October 1993 to December 1995 — (1530 Bryant Avenue [defendant City])
(1) Victor Peri
Lead level 4 /xg/dL on February 13, 1996
(2) Harvey Arzu
Lead level 14 /xg/dL on March 24, 1994
Lead level less than 5 ¿xg/dL in 1996
(3) Jose Peri
Lead level 13 /xg/dL on March 24, 1994; and 8 jag/dL on April 11, 1994; and less than 3 ¿xg/dL on February 13, 1996
Argument of Defendant LSL
LSL moves for summary judgment, arguing, in essence, that the infant plaintiffs did not sustain any lead paint poisoning while residing at its apartment. Defendant LSL relies upon the Centers for Disease Control’s 1991 and 1997 guidelines on elevated blood lead levels. According to the CDC standards, a child must have a blood lead level of 10 /xg/dL or higher in order to be considered eligible for monitoring and further testing.[5] LSL argues that Victor and Jose’s lab test results during this period indicate that they were at all times under the 10 yxxg/dL level while at the LSL apartment and thus not exposed to lead paint while there. As to the remaining child, Harvey, LSL argues that plaintiffs did not adequately prove that Harvey Arzu (as distinguished from Horug Arzo) sustained lead paint poisoning while residing at any of the properties in question.
As to Victor
While Victor was living in the apartment, his lead level was 6 ,Lig/dL, which defendant argues is within normal limits and is not indicative of any lead poisoning. Moreover, defendant LSL maintains that the lead poisoning of Victor is consistent with ingestion of lead at other locations. In this regard, defendant LSL points out that Victor was first diagnosed with an elevated blood lead level of 26 /xg/dL on October 8, 1991, approximately six months prior to the family’s move to the LSL apartment; that it steadily decreased to 24 yixg/dL on October 24, 1991; and to 13 /xg/dL on February 25, 1992; and finally to 6 /xg/dL on *374 September 2, 1992 when residing in the LSL apartment. Thus, it is argued, there is no basis on which plaintiffs may claim continued exposure while in the LSL apartment.
As to Jose
Jose Peri was born on July 7, 1992, while the family was living at 2730 Decatur Avenue, i.e., the LSL apartment. While residing at this apartment Jose was never found to have any elevated blood lead level. He was first diagnosed with an elevated blood lead level of 13 pug/dL on March 24, 1994, five months after the family moved out of the LSL apartment. LSL relies on the opinions of Richard M. Blume, M.D., to reinforce its theory that Jose did not sustain lead paint poisoning while living at its property.
As to Harvey
LSL contends that the evidence of alleged lead paint poisoning as to Harvey Arzu is inadequate. Plaintiffs, however, rely on a lab report for “Horug Arzo” dated July 14, 1993, which shows an elevated blood lead level of 18 pug!dL. Plaintiff contends that Horug Arzo and Harvey Arzu are one and the same, that the name was merely garbled by the lab. According to LSL, the lab report is questionable because the name on the record is “Ho-rug Arzo,” and because the screening test used, i.e., a micro lead procedure, is really a capillary/fingerstick test, which can be inaccurate, and thus is not reliable to diagnose an elevated blood lead level. In that regard, LSL relies upon CDC guidelines that distinguish the capillary/fingerstick test (which is conducted as a screening) from a venous test (which is diagnostic). LSL argues, therefore, that the alleged finding of an elevated blood lead level of 18 pug/d/L made on the unreliable capillary/ fingerstick test is therefore suspect and should be inadmissable. It is LSL’s contention that only medically acceptable tests may be admitted as evidence to the court on this motion as well as at trial.
Plaintiffs Opposition to LSL’s Motion
Plaintiffs oppose defendant LSL’s motion for summary judgment. With respect to plaintiff Victor Peri, they assert that lead damage can occur at levels below 10 pg/dL, despite the fact that 10 pug/dL is the level defined as lead poisoning by New York governmental agencies.[6]
As to Jose Peri, plaintiffs maintain that he sustained lead paint poisoning while living in the LSL apartment, based on a *375 March 5, 1993 report from Centralized Laboratory Services, Inc., which indicated that Jose’s zinc protoporphyrin test indicated that he had a level of 34 ¡xg!dL, which plaintiff claims is allegedly a suggestion of some level of lead exposure. Moreover, plaintiffs claim that a subsequent lead test conducted on July 14, 1993 indicated (although without numeric calculation) that Jose’s levels were “abnormal.” Plaintiffs concede that no actual numeric entry as to the infant’s blood lead level is legible on the report, yet they argue that other entries on the slip indicate an “abnormal” test result.
Plaintiffs maintain that Harvey Arzu was also injured while at the LSL premises. They claim that the lab results from July 14, 1993 are for Harvey, despite the reference to “Horug Arzo” on the slip. Plaintiffs also rely on the fact that Harvey’s HIP number is the same number on the lab results bearing the misspelled name. Plaintiffs further argue that LSL failed to provide any proof that a “micro lead” test is really the suspect capillary/ fingerstick test, and plaintiffs maintain further that even if it was the unreliable “fingerstick” test, Harvey’s results still would be deemed as elevated.
Lastly, plaintiffs point out (1) that Environmental Management Systems, a private entity apparently hired by plaintiffs’ attorneys, investigated the LSL premises in September 1999 and discovered painted surfaces with lead content in excess of .7 mg/cm2, exceeding the legal maximum, and (2) that the New York City Department of Health issued several orders to abate lead violations at the LSL premises.
Argument of Defendant City
Defendant City also moves for summary judgment dismissing all of the plaintiffs’ claims. The City argues that the notices of claim were untimely, and further, that the City did not have notice of the presence of children in the City’s Bryant Avenue apartment.[7] The City further contends that there is no “evidence” of the infant plaintiffs’ exposure to lead while residing in the City apartment. (It should he noted that the City does not *376 dispute that tests performed by plaintiff appear to indicate that lead based paint was present in the City apartment.) The City bases its argument on the fact that the infants Victor and Harvey were not diagnosed with elevated blood lead levels while residing at the City apartment, and that no other evidence exists to show that Jose suffered injuries as a result of lead paint while residing there. Based on the test results for all three children, Department of Health records, and evidence provided by plaintiffs, the City argues that neither Victor, Harvey, nor Jose sustained injury due to lead paint exposure while living at 1530 Bryant Avenue, the city-owned premises.
Lastly, the City argues that it owed no special duty to the infants while they resided on non-City-owned premises.
Plaintiffs Opposition to Defendant City’s Motion and in Support of Cross Motion to File Late Notices of Claim
Plaintiffs argue that during plaintiffs’ residency at 51 West 119th Street, owned by defendant Nebblett, the City initiated a special relationship and voluntarily assumed a duty to protect the infant plaintiffs, by advising and counseling Eribel Peri. Plaintiffs concede that the notices of claim were untimely; however, they argue that they should be deemed timely pursuant to the tolling provisions of General Municipal Law § 50-e and CPLR 208. (See also Cohen v Pearl Riv. Union Free School Dist., 51 NY2d 256 [1980].) Plaintiffs argue further that infants suffered lead related injuries while living at the Bryant Avenue city-owned apartment, despite the findings as to blood lead levels during those times. Plaintiffs rely on case law, medical journals and the affirmation of Dr. Savino (a pediatrician) in an attempt to establish factually that even low blood lead levels can cause injury and are therefore actionable. Plaintiffs also seek permission to file late notices of claim with respect to the city-owned apartment.
Discussion
Defendant LSL’s motion
This court notes that an EMS report and investigation undertaken at the LSL premises in September 1999 revealed painted surfaces with lead content in excess of .7 mg/cm.2, and in addition, that DOH issued several orders to abate lead violations at the LSL premises. Consequently, there exists a cogent evidentiary basis which raises an issue of fact as to the presence of lead in the apartment.
This court also finds that an issue of fact exists as to whether it was plaintiff Harvey Arzu (as opposed to a person with a sim *377 ilar name) who had lead levels of 18 while residing at LSL’s premises. There is some evidence, at least at this juncture, from which a jury may find that the test results attributed to “Horug Arzo” actually belong to the infant plaintiff Harvey Arzu, and that he had an elevated blood lead level while residing at LSL’s premises. The test report as to Horug Arzo indicates that a “micro lead” test was performed, and it is not clear at this time, as a matter of law, that this test is the allegedly unreliable “micro/fingerstick test.” In any event, even if it is established that the test actually performed was indeed the “micro/ fingerstick test,” applying a margin of error of 5 ¡xg!dL as maintained by plaintiffs’ expert Dr. Savino, the test would still create an issue of fact as to an elevated lead level of 13 p-g/dL.
As to Jose Peri, plaintiff argues that Jose had an abnormal zpp test on March 5, 1993. It is clear to the court that this was not an abnormal finding. This court credits the information provided by LSL in the form of an affidavit from the director of the laboratory where the testing was done, which indicates that as to Jose, the symbol “<34” for the zinc protoporphyrin level really means less than 34. Since the report merely stated that the result was “less than” 34 pg/dL, it actually means that no abnormal reading was found. In addition, a blood lead test performed on July 14, 1993 indicated “see sep. [separate] report,” and thus also does not constitute a finding of lead poisoning. Plaintiff attempts to argue that notations on the report — asterisks and designations of normal and abnormal ranges — somehow represent an indication that the result was abnormal. These arguments are based on mere speculation. In fact, the court has examined that report and others in the papers submitted, and it is clear even to an untrained observer that the asterisks and other markings are clearly just notations contained on a preprinted form. There is, then, no evidence that Jose sustained any lead poisoning at any time while he resided at the LSL premises. Plaintiffs additional arguments, i.e., that there was lead in the apartment, and that Harvey may have sustained lead poisoning on the premises, cannot overcome the fact that Jose was not diagnosed with any lead contamination until March 24, 1994, i.e., two years later when he returned to 1530 Bryant Avenue. The statements in plaintiffs own notice of claim admit that Jose was first diagnosed with lead poisoning on March 24, 1994. The affidavit of Dr. Lidsky, plaintiffs neuropsychologist, which is annexed to the affirmation of John Daly dated October 28, 2003, contains the same statement. In view of *378 the lack of any evidence of lead poisoning, Jose’s claim against LSL must be dismissed.
As to Victor Peri, there is a compelling showing by LSL that the level of lead in his system during their residence at defendant LSL’s premises was less that 10 /xg/dL, and that his lead levels had been steadily declining since October 1991. However, is there sufficient evidence for a jury to conclude that the low level was in any way related to conditions in the apartment? And if so, are such low levels actionable?
Unlike Jose, there is proof that Victor had evidence of some level of lead in his blood while residing at the LSL apartment. As noted, LSL argues that Victor’s levels were steadily declining during this time. Nevertheless, there is evidence that lead-based paint was present in the apartment. In a similar case involving sharply disputed facts and theories of liability, the Appellate Division denied summary judgment to a defendant contractor whose allegedly negligent removal of lead-based paint exposed the infant to lead. The Court did so despite evidence that the infant’s blood lead level decreased following the repairs, and despite the argument that any link between the infant’s lead poisoning and the repair work was speculative. (Vega v S.S.A. Props., Inc., 13 AD3d 298 [1st Dept 2004].)
In arguing that low blood lead levels are not actionable, defendant LSL relies on Arce v New York City Hous. Auth. (265 AD2d 281 [2d Dept 1999]). In Arce, the Court set aside a verdict after trial, and clearly indicated that the micro/fingerstick test is not as accurate as other tests. However, that Court did not hold that this test is not admissible in evidence, or that blood lead levels of under 10 pgldL cannot support a verdict. Rather, the Court’s decision turned on an evaluation of the trial evidence as a whole, including facts indicating that the one and only test indicating an elevated blood lead level was erroneous, and that a blood test administered only 11 days after the first test indicated a normal blood lead level of three micrograms per deciliter, which all of the experts agreed represented an unlikely if not impossible drop over such a short period of time.
In Cunningham v Spitz (218 AD2d 639 [2d Dept 1995]), the Appellate Division denied summary judgment in a case where the infant plaintiff’s blood lead level was under the defined threshold for lead poisoning. The brief memorandum decision in that case, however, provides little guidance (at 639):
“The plaintiffs raise triable issues of fact as to whether the plaintiff Elton Cunningham was injured *379 as a result of his exposure to lead, notwithstanding the fact that his blood-lead level did not fall within scientifically accepted definitions of lead poisoning. The allegation is not that Elton Cunningham suffered lead poisoning but that as a result of his exposure to lead he was injured (see, German v Federal Home Loan Mtge. Corp., 885 F Supp 537). Therefore, the defendants’ motion for summary judgment was properly denied (see, Alvarez v Prospect Hosp., 68 NY2d 320).”
None of the cases cited by either party definitively state whether or not blood lead levels of less than 10 pg/dL are, or are not, actionable. A finding that such levels are not actionable would contravene dicta in Pelaez (and other cases) in which the Court of Appeals observed, “Even at low levels, lead paint poisoning can harm the central nervous system and cause health problems such as impaired growth, hearing loss and limited attention span.” (Pelaez v Seide, 2 NY3d 186, 197 [2004].)
The case as to Victor may be characterized as tenuous. Nevertheless, the court concludes that there is a basis on which a jury might find that Victor sustained some level of lead contamination while in the LSL apartment. Whether there is an accepted medical theory on which blood lead levels of less than 10 pg/dL may be attributed to injury is a matter best addressed at the appropriate juncture in this case, and not on the present motion. Consequently, although the proof is quite sparse as to whether there was any exposure to lead while in the LSL apartment, plaintiffs Victor and Harvey should be afforded an opportunity to establish at trial or at an appropriate pretrial hearing whether or not the detection of low levels of lead in the bloodstream is generally accepted as scientific evidence of lead poisoning which results in injury, and whether said low levels were contributed to by exposure to lead in the LSL apartment. Accordingly, the defendant LSL’s motion, except as indicated above, is denied.
Defendant City’s Motion and Plaintiffs Cross Motion
The argument raised by plaintiff that the City may be liable based on a special duty is rejected based on the holding of Pelaez v Seide (2 NY3d 186 [2004]). Nor is the City liable for the operation of the Nebblett building, which was privately owned and maintained at the relevant time by a 7A Administrator. The City is statutorily exempt from liability when a building is under the control of a 7A Administrator. (RPAPL 778 [7].)
*380 Consequently, the only possible viable claims raised by plaintiffs against the City are for negligence in failing to abate the lead condition at the city-owned property. Whether or not these claims may proceed requires a determination as to whether the late notices of claim should be permitted, and in addition, whether plaintiff has raised issues of fact requiring a trial as to the presence of the plaintiffs at the apartment.
This court is persuaded that leave should not be granted on plaintiffs cross motion to serve a late notice of claim as to the initial period of occupancy. Plaintiffs have not advanced a sufficient excuse for failing to serve a notice of claim with respect to the initial occupancy on behalf of the two infant plaintiffs who resided there. It is not denied that counsel was consulted as early as 1991 with respect to lead poisoning, and yet no effort was made to file a notice of claim at that time.
In addition, plaintiffs were not the tenants of record (they were residing with the plaintiff mother’s sister), and there is absolutely no documentation or other reliable evidence to suggest that plaintiffs had any contact with the building personnel. In this regard, although plaintiffs’ affidavit appears to raise allegations of contact and discussion with building personnel, said statements are completely at odds with her earlier EBT testimony. As noted by the First Department, while issues of fact and credibility may not ordinarily be determined on a motion for summary judgment “where, as here, the self-serving affidavits . . . clearly contradict plaintiff’s own deposition testimony and can only be considered to have been tailored to avoid the consequences of her earlier testimony, they are insufficient to raise a viable issue of fact to defeat defendant’s motion for summary judgment.” (Phillips v Bronx Lebanon Hosp., 268 AD2d 318, 320 [2000].)
There is also no evidence of elevated blood lead levels. Consequently, while the City has limited its argument with respect to evidence of actual lead poisoning, it is noted that there were no elevated blood lead levels which might have resulted in generating DOH reports or investigations. There is therefore no evidence of actual knowledge of the potential claim by the City.
Moreover, it cannot be said that the lack of notice, with regard to the first alleged period of occupancy, did not prejudice the City. The City, which might otherwise have had an opportunity to determine the condition of the paint in the premises, did not have the opportunity to timely determine whether or not the paint was peeling, or covered by layers of intact, nonleaded *381 paint, or was otherwise in “good” condition during that time period. The exact nature of these circumstances (i.e., the condition of the painted surfaces) is not affected by knowledge that there was lead paint in the premises.
With respect to the second alleged period of occupancy, however, a different result obtains, for the simple reason that the late notices were served in December 1995, i.e., at the end of the second alleged period. As to this second time period, the notices of claim were sufficiently contemporaneous in time as to give the City notice of the underlying facts within a reasonable time after the claim accrued, thus obviating any prejudice to the defendant City.
Conclusion
The motion of defendant LSL is granted to the extent of dismissing the claims of Jose Peri, and is otherwise denied. The motion of defendant City is granted to the extent of dismissing all claims except those relating to alleged lead poisoning arising from the second period of occupancy in the City building as set forth in the notices of claim which were served in December 1995. The cross motion is granted only to the extent of deeming timely served the notices of claim which were served in December 1995, relating only to the second period of occupancy.

. The parties assign a level of 26 or 43 to this report. The court will adhere to the 43 finding; in any event, what is important is that the level was elevated over accepted norms.

. The parties dispute whether or not “Horug Arzo” and plaintiff Harvey Arzu are one in the same. Significantly however, the report for Horug bears a similar HIP number as that for Harvey.

. This test is characterized in the report as a “Micro Lead” test. The exact nature of this test is disputed. (See infra.)

. An elevated zpp test may be indicative of lead poisoning, according to the argument of the plaintiffs. However, as I more fully explained later in this writing, the director of the lab has adduced cogent evidence that a reading of “<” (i.e., “less than”) is a normal reading indicating only that the level was at a number between 0 and 33. Thus, the zpp level was not elevated, but was in the 1 to 33 normal range. Indeed, plaintiff’s own expert William Savarese *373 states in his affidavit annexed to the affirmation of John Daly dated October 28, 2003, that only a reading greater than 34 jtxg/dL represents an abnormal finding.

. In 1991, the CDC lowered the intervention threshold for blood lead level from 25 /xg/dL to 10 ng/dL, and recommended case management for children with levels of 15 /xg/dL or higher.

. See Campbell v Metropolitan: Prop. & Cas. Ins. Co. (239 F3d 179 [2d Cir 2001]) for an extensive discussion of lead poisoning.

. In this regard, the City argues that the apartment was not rented in the name of the plaintiffs, but rather, the one-bedroom apartment was rented to a childless couple, Dinora Castillo and Norberto Morales. The lease for Dinora and Norberto was for December 1, 1986 until August 1995. Plaintiffs’ mother, Erihel Peri, lived at the apartment from 1987 until May 1991. During that time, the City maintains, Erihel was not a signatory to the lease, never paid rent, and never made herself known to building managers. As to this last contention, see the discussion {infra) concerning the alleged disparity between plaintiff mother’s examination before trial (EBT) testimony and her affidavit.