OPINION OF THE COURT
 

 Rosenblatt, J.
 

 In these two cases, we must decide whether plaintiffs—children injured by exposure to lead paint—may hold a municipality liable in tort based on certain inspection and health counseling services. As a rule, municipalities are immune from tort liability when their employees perform discretionary acts involving the exercise of reasoned judgment. In a narrow exception to the rule, we have upheld tort claims when plaintiffs have established a “special relationship” with the municipality. In the appeals before us, plaintiffs have not made such a showing, and we therefore affirm the dismissal of both complaints against the municipal defendants.
 
 [1]
 

 L
 

 Pelaez v Seide
 

 Maria Nancy Pelaez gave birth to twin boys, plaintiffs Christopher and Servando, in January 1994. In November, the family moved into a house on Center Street in Brewster, Putnam County. Defendants Gary and Laura Seide owned the property and employed defendant Peter Glass as caretaker.
 

 Soon after moving in, Christopher and Servando experienced a host of medical problems, including stomach aches, diarrhea and vomiting. Eventually, they underwent blood tests. Servándoos blood lead level tested at 20 micrograms per deciliter (meg/ dl), and his physician notified the County of the results.
 
 [2]
 
 On March 2, 1995, Susan Ortiz, a registered nurse who served as Childhood Lead Poisoning Prevention Program Coordinator for the Putnam County Department of Health (PCDOH), learned of Servando’s elevated blood lead level and sent Pelaez an infor
 
 *194
 
 mational pamphlet about lead poisoning. She also contacted Lawrence Werper, a public health engineer for the PCDOH, so that he could inspect the premises.
 

 In March 1995, Werper visited the home several times to test for lead paint. No one was home on his first visit, but he took paint samples from the outside of the house, and they tested positive for lead. A few days later, Werper tested paint samples from inside the home and determined that the property contained no lead-safe rooms. On March 14, the County issued a notice and demand for discontinuance, ordering abatement by April 7.
 

 Werper visited again on March 29, accompanied by Ortiz. While Ortiz spoke with Pelaez and the children, Werper inspected the premises and saw that abatement had not yet begun. According to Pelaez, Ortiz told her to follow a regimen that would help the children’s condition, such as feeding them vegetables, removing the carpet and mopping the floors instead of sweeping them. Ortiz also performed a developmental assessment of the children—in her words, she picked them up and noted that although they were small for their age, they could raise their arms, look at her when she spoke to them, hear her properly and support their own weight. Pelaez stated that Ortiz did not advise her that lead poisoning “was a very dangerous thing,” or suggest that she move her family from the premises.
 

 Ortiz and Werper continued to watch the situation over the next few months. On April 24, Werper returned to the residence and found that abatement was proceeding inadequately. He issued a notice of hearing to the landlord, but later cancelled the hearing when a June inspection showed progress. Although Werper admitted that he did not aggressively press the owners or discuss the dangers of lead poisoning with Pelaez, Ortiz returned to the home in April to make sure that Pelaez was following her instructions. She also sent Pelaez a letter in May 1995, after further testing showed that Servando’s blood lead levels dropped to 13 mcg/dl. In the letter, Ortiz applauded the improvement and said that Servando did not need to be retested until September.
 

 Werper reinspected the premises on August 9 and September 14. He determined that abatement was not proceeding well enough and reissued the notice of hearing for October 11, 1995 before a Putnam County administrative hearing officer. At the hearing, the judge ordered defendant Glass to relocate the children immediately.
 

 
 *195
 
 The children were retested the very next day. Christopher’s blood lead level was 50 mcg/dl, and Servando’s measured 70 mcg/dl. Recognizing that these levels constitute medical emergencies, Ortiz had the children admitted to the hospital, where they underwent chelation treatment. The day after the children entered the hospital, Werper had the house condemned as unfit for human habitation.
 

 Plaintiffs commenced this personal injury action against the Seides, Glass, Putnam County and its DOH, claiming that the children suffered neurological and behavioral injury based on defendants’ negligence and dereliction. The Putnam defendants moved for summary judgment, which Supreme Court denied, determining that there were questions of fact as to the existence of a special relationship.
 

 The Appellate Division reversed and dismissed the complaint against the County defendants, holding that the employees’ conduct involved discretion and judgment, which could not result in liability even if their actions were negligent. Further, the Court found that no special relationship existed. It also determined that because the Public Health Law was enacted for the benefit of the general public—and not to protect a special class of persons, such as children—the County violated no statutory duty. Lastly, the Court concluded that plaintiffs did not raise issues of fact that the County voluntarily assumed either a duty to protect the children, or assumed a positive direction or control over the situation.
 

 Harris v Llewellyn
 

 In 1988, Debbie Harris moved to an apartment on Newkirk Avenue in Brooklyn. She gave birth to her daughter, plaintiff Ashley, four years later. In September 1996, Ashley’s blood lead level tested at 33 mcg/dl, triggering intervention by the City of New York. A City Department of Health public health advisor (PHA) visited the Harrises at home and provided nutritional and hygienic advice to help lower Ashley’s lead levels. Also, a City DOH public health sanitarian (PHS) inspected the apartment using an x-ray fluorescence machine, finding that many painted surfaces in the apartment contained hazardous levels of lead.
 

 In October 1996, City DOH issued an order to abate nuisance, but when a PHS and PHA reinspected the apartment in November, they determined that abatement had not begun. In the meantime, the PHA provided Harris with further nutritional
 
 *196
 
 and hygienic counseling. Later that month, the Harrises temporarily relocated to another apartment while the landlord abated the condition. In January 1997, the landlord told Harris that the process was complete and that she and Ashley could return to the apartment, which they did. On the 17th, a PHS inspected the apartment again. She observed that the landlord appeared to be in compliance and took a single dust wipe sample that tested negative for lead dust. According to Harris, the PHS told her that all lead had been removed from the apartment.
 

 Over the next year, Ashley’s blood lead levels remained elevated. In January 1997, she tested at 28 mcg/dl, prompting a PHA to visit Ashley’s pediatrician to discuss the situation. The PHA returned to the Harris home in February 1997, noting in his report that the apartment had been fully abated but that Ashley’s blood lead levels still remained high. For several months in 1997, Ashley continued to show elevated lead levels, and she eventually entered a lead poisoning treatment program. Ashley’s hospital records for these treatments reveal that her mother believed all lead violations had been abated as of January 1997, and that the DOH had personally confirmed the abatement. ~
 

 In May 1997, the Harrises sued the City and the landlord, alleging negligence and related causes of action. Although Ashley’s blood lead levels dropped below 20 mcg/dl
 
 [3]
 
 after November 1997, they hovered in the teens in tests administered through 1998. In September 2000, when plaintiffs had the apartment tested by an independent environmental consulting company, the results revealed that 31 of 45 surfaces tested contained hazardous levels of lead.
 

 In 2001, plaintiffs and the City moved for summary judgment. Supreme Court granted the City’s motion, and the Appellate Division affirmed, concluding that the city lead paint regulations protected the general public and not a specific class of persons as needed to establish a special relationship. The Court further held that the City did not undertake a duty to plaintiffs by giving them nutritional and hygienic advice and did not assume positive direction and control of a known hazardous situation. We now affirm in both cases.
 

 
 *197
 
 IL
 

 This Court has recognized lead paint poisoning as a “serious health problem,” especially for young children
 
 (Matter of New York City Coalition to End Lead Poisoning v Vallone,
 
 100 NY2d 337, 342-343 [2003]). Even at low levels, lead paint poisoning can harm the central nervous system and cause health problems such as impaired growth, hearing loss and limited attention span.
 
 [4]
 
 In 1992, the Legislature passed the Lead Poisoning Prevention Act (Public Health Law §§ 1370—1376-a) “to prevent lead poisoning in children and others” (Governor’s Program Bill Mem, Bill Jacket, L 1992, ch 485, at 6). As relevant here, Public Health Law § 1370-a (1) requires the DOH to “exercise any and all authority” to create programs that establish and coordinate activities to prevent lead poisoning and minimize the risk of exposure to lead. Subdivision (2) specifies certain required actions, such as screening for children and pregnant women, monitoring children and pregnant women who have elevated blood lead levels, and the development of public education and community outreach programs on lead exposure, detection and risk reduction
 
 (see
 
 Public Health Law § 1370-a [2] [a]-[d]).
 

 Pursuant to the legislation, Putnam County and New York City have developed programs addressing the problem of lead paint. Putnam County received state approval and funding to establish a Childhood Lead Poisoning Prevention Program (CLPP) and developed a plan to help reduce the prevalence of elevated blood lead levels in children under six years of age. The County drafted guidelines for screening, case management, documentation and reporting, case review and quality assurance. Also, the protocols provide for home visits by a public health nurse. They supply a “home visit packet” that includes questionnaires “used to assess the child for signs and symptoms of lead poisoning,” a nutritional assessment sheet, an environmental source checklist and educational materials for the family-
 

 The County has also produced a worksheet entitled “Prevention is Everyone’s Responsibility,” asking parents of children with lead poisoning to “take the following precautions in your
 
 *198
 
 home for your child’s safety to help lower his/her blood lead level to normal limits.” The worksheet instructs parents, for example, to wash the child’s hands frequently, to be sure that their child’s diet includes ample iron and calcium, to keep children away from areas being renovated and to clean with a wet mop or rags, rather than a broom or vacuum cleaner.
 

 For its part, the New York City Health Code regulates intervention by the City DOH on behalf of a lead-poisoned child
 
 (see
 
 24 RCNY 173.13). As of January 1, 1997, subdivision (d) (2) allows the City DOH to order the abatement of lead paint hazards when “there is a child under 18 years of age with a blood-lead level of 20 micrograms per deciliter or higher residing in any dwelling,” and the DOH determines that the lead paint poses a hazard to the child. Before January 1, 1997, this subdivision afforded this protection to “any person,” as opposed to just children under age 18
 
 (see Valencia v Lee,
 
 123 F Supp 2d 666, 674 [ED NY 2000]).
 
 [5]
 
 Against this statutory and regulatory background, we address the issue of municipal liability in damages for alleged negligence.
 

 IIL
 

 We are often called upon to determine the existence of a duty in negligence cases. When it comes to municipal liability, we note that 75 years ago the State waived its immunity from liability when it enacted former section 12-a (now section 8) of the Court of Claims Act
 
 (see
 
 L 1929, ch 467). Although that liability extends to the State’s political subdivisions,
 
 [6]
 
 it is not absolute.
 
 [7]
 

 As we noted in
 
 Lauer v City of New York
 
 (95 NY2d 95, 99 [2000]), “[a] public employee’s discretionary acts—meaning conduct involving the exercise of reasoned judgment—may not result in the municipality’s liability even when the conduct is negligent.” To impose liability, there must be a duty that runs from the municipality to the plaintiff. We have recognized a narrow class of cases in which a duty is born of a special rela
 
 *199
 
 tionship between the plaintiff and the governmental entity. When such a relationship is shown—and it is plaintiff s burden to establish it—the government is under a duty to exercise reasonable care toward the plaintiff
 
 (see Garrett v Holiday Inns,
 
 58 NY2d 253, 261 [1983]).
 
 [8]
 

 A special relationship can be formed in three ways: (1) when the municipality violates a statutory duty enacted for the benefit of a particular class of persons; (2) when it voluntarily assumes a duty that generates justifiable reliance by the person who benefits from the duty; or (3) when the municipality assumes positive direction and control in the face of a known,
 
 *200
 
 blatant and dangerous safety violation
 
 (see id.
 
 at 261-262). None apply here.
 
 [9]
 

 A. Violation of a Statutory Duty
 

 To form a special relationship through breach of a statutory duty, the governing statute must authorize a private right of action. One may be fairly implied when (1) the plaintiff is one of the class for whose particular benefit the statute was enacted; (2) recognition of a private right of action would promote the legislative purpose of the governing statute; and (3) to do so would be consistent with the legislative scheme
 
 (see Sheehy v Big Flats Community Day,
 
 73 NY2d 629, 633 [1989]). If one of these prerequisites is lacking, the claim will fail. Thus, in
 
 O’Connor v City of New York
 
 (58 NY2d 184 [1983]), we rejected the plaintiffs argument that the City violated a statutory duty by issuing a “blue card” approving a faulty gas piping system that later exploded and killed several people. Although it was obvious that blue card approval should not have been granted, we determined that a private right of action was unavailable. The regulations, we held, were intended to protect the general public—as opposed to a particular class of persons—and plaintiff therefore could not satisfy the first
 
 Sheehy
 
 prong.
 

 In
 
 Uhr v East Greenbush Cent. School Dist.
 
 (94 NY2d 32 [1999]), we noted that the first two
 
 Sheehy
 
 prongs were satisfied, but dismissed the claim based on the plaintiffs failure to satisfy the third prong, requiring that a private right of action be consistent with the legislative scheme. The case involved a student diagnosed with scoliosis who claimed that her school district—which was mandated to administer scoliosis examinations—was negligent in failing to test for the condition. We recognized that the Education Law could be enforced administratively, and that the Legislature’s failure to amend the statute and provide for a private cause of action was strong evidence of
 
 *201
 
 its contrary intent, in light of decisional law denying liability where a school district had failed to administer scoliosis tests.
 

 Given our precedents and the thrust of the Lead Poisoning Prevention Act, we conclude that a private right of action is not available under the statute. Therefore, plaintiffs may not assert a special relationship based on a claimed violation of a statutory duty.
 

 Clearly, plaintiffs meet the first prong, as part of the class to be benefitted. The Lead Poisoning Prevention Act specifically mentions children and pregnant women as the statutory beneficiaries
 
 (see e.g.
 
 Public Health Law § 1370-a [2] [a]). Moreover, the Bill Jacket is filled with references to the protection of children
 
 (see e.g.
 
 Governor’s Program Bill Mem, Bill Jacket, L 1992, ch 485, at 12; Mem of Assembly Member Eve,
 
 id.
 
 at 17; Governor’s Approval Mem,
 
 id.
 
 at 27). Indeed, the Putnam County protocols list children under the age of six as the class of persons they intend to protect. In New York City, the pertinent regulation (24 RCNY 173.13 [d] [2]) was amended effective January 1, 1997, to apply to children under age 18, and it was during that month the city inspector told the Harrises that the apartment was lead-free.
 

 Creation of a private right of action, however, is not consistent with the legislative scheme, and thus fails under the third
 
 Sheehy
 
 prong. While a private right of action might, at least indirectly, promote the ultimate legislative purpose—reducing lead paint hazards—and thus satisfy the second
 
 Sheehy
 
 prong, it does not comport with the legislative scheme. The enactment contemplates a program of oversight in which the role of government is, in the main, administrative and advisory. Municipalities participate by conducting lead screening, compiling a statewide registry for children with elevated lead levels, and developing public education and community outreach programs
 
 (see
 
 Public Health Law § 1370-a [2]). Insofar as they can compel property owners to abate the nuisance, municipalities have a hand in enforcement
 
 (see
 
 Public Health Law § 1373), but in all, the Public Health Law is best read to assure that owners, not government, bear the ultimate responsibility for compliance.
 

 Opening municipalities to liability for carrying out their duties imperfectly could even disserve the statutory objective by, causing municipalities to withdraw or reduce services in dealing with lead paint. Lawsuits are not the only way to deal with the problem. We read the legislative design as encouraging munici
 
 *202
 
 palities to cooperate administratively, while preserving the tort remedy against owners, when appropriate.
 

 B. Voluntary Assumption of a Duty
 

 Most of our municipal special relationship cases have centered on whether a municipality has assumed an affirmative duty that generated justifiable reliance by the plaintiff. We laid out the test in
 
 Cuffy v City of New York
 
 (69 NY2d 255 [1987]). It requires (1) an assumption by a municipality, through promises or actions, of an affirmative duty to act on behalf of the injured party; (2) knowledge on the part of a municipality’s agents that inaction could lead to harm; (3) some form of direct contact between the municipality’s agents and the injured party; and (4) that party’s justifiable reliance on the municipality’s affirmative undertaking
 
 {id.
 
 at 260).
 

 Undisputedly, the officials in both cases had direct contact with the plaintiffs. Their claims fail, however, because neither municipality voluntarily assumed a duty on which plaintiff could justifiably rely. In retrospect, the municipal employees in both cases may have carried out their duties imperfectly, and it surely would have been far better—and the harm perhaps avoided— had the Putnam authorities been more aggressive and the New York officials more thorough. But that is not the test. If it were, municipalities in all their governmental functions would be insurers of the safety of their citizens and be open to liability whenever it can be shown that they could have or should have done better.
 

 The Pelaez plaintiffs argue that the County exceeded its responsibilities and took on affirmative duties by offering advice as to nutrition and hygiene. They also fault the County for eliciting medical information about the children, for promising to conduct reinspections and ensure abatement, and for following up with visits and letters erroneously advising them that it was not necessary to take Servando for testing until September. The Harris plaintiffs similarly argue that the health and hygienic advice provided by the City went beyond the purview of the Public Health Law. We disagree. On this record, we cannot say that in their contacts with plaintiffs either municipality took on an affirmative duty to act on plaintiffs’ behalf. Indeed, when dealing with plaintiffs, the officials did not go beyond the mandates of the lead paint laws.
 

 The Public Health Law calls for the inspection and counseling activities undertaken by the municipalities. Public Health
 
 *203
 
 Law § 1370-a (1) directs that lead poisoning prevention programs “be responsible for establishing and coordinating activities to prevent lead poisoning and to minimize risk of exposure to lead.” Further, subdivision (2) (d) mandates the development and implementation of “public education and community outreach programs on lead exposure, detection and risk reduction.” Providing advice on health and hygiene issues is a governmental activity meant “to prevent lead poisoning and to minimize risk of exposure to lead.” It also constitutes education and outreach, thus falling well within the statute.
 

 Moreover, the Putnam County protocols expressly provide for home visits and follow-ups by public health nurses. Thus, Ortiz’s follow-up visit and letter were not over and above the protocols. Indeed, the home visit packet contains a questionnaire “used to assess the child for signs and symptoms of lead poisoning.” The questionnaire includes medically-related queries, such as whether the child exhibits pica, has convulsions, or has problems hearing or speaking clearly. Thus, the developmental assessment was plainly within the protocols. Moreover, any promises by the inspector did not fall outside the inspection and enforcement tasks the statute contemplated.
 

 In light of our holding that the County and City did not voluntarily assume an affirmative duty, we need not address whether the plaintiffs justifiably relied on the County’s and City’s actions.
 

 C. Positive Direction and Control
 

 Lastly, a special relationship may be formed when a municipality assumes positive direction and control in the face of a known, blatant and dangerous safety violation.
 
 Smullen v City of New York
 
 (28 NY2d 66 [1971]) is the prototypical case for this exception. Applying the criterion, we found a special relationship between the municipality and a worker who was killed when a trench collapsed. Before entering the trench, a city inspector, who was in control of the site and had the power to stop work, assured the worker the trench was “solid.”
 
 (Id.
 
 at 69.) Indeed, the trial court instructed the jury that there could be no recovery against the City in the absence of a finding that “the inspector assumed control and direction of the work and that such a conclusion could only be arrived at if it could be found that he gave decedent ‘an order or affirmative instruction to enter the excavation.’ ”
 
 (Id.)
 
 The trench, however, had not been braced or shored as required by regulation. We sustained a
 
 *204
 
 verdict for the plaintiff, “because of the city’s actual knowledge of the dangerous condition and its failure to do anything about it at a time when the inspector was directly on hand as the peril heightened”
 
 (id.
 
 at 71).
 

 Here, however, neither municipality assumed positive direction or control in the face of a known, blatant and dangerous safety violation. The Pelaez plaintiffs argue that the County took control of the situation by failing to inform Pelaez of the dangers of abatement and allowing her to believe that the implementation of health and hygiene measures would protect her children. She also contends that the County promised to perform further inspections and ensure abatement, but instead took no action for several months even though the landlord did not properly comply. Similarly, the Harris plaintiffs argue that the City took control by identifying violations, ordering abatement, providing health and hygiene counseling, and assuring them the apartment was safe, although a later inspection showed that abatement had not been successful.
 

 The record reveals that, although the municipalities had personal contact with plaintiffs, they did not take positive direction and control of either situation. By way of contrast, the city inspector in
 
 Smullen
 
 had the power to prevent the worker from entering the trench, and could have halted the work altogether
 
 (see id.
 
 at 73). We recognize that municipalities have certain enforcement mechanisms at their disposal, such as the ability to issue a notice and demand for discontinuance
 
 (see
 
 Public Health Law § 1373), but property owners must first fail to comply before the municipality can take steps, such as applying for a receivership
 
 (see
 
 Public Health Law § 1374). Here, the landlords, as opposed to the municipalities, were in immediate control of the abatement process and had shown some level of compliance. The municipalities monitored the process and urged it along but did not take control of abatement.
 

 Moreover, providing health and hygiene advice does not constitute positive direction and control. The actions of the officials in both instances were largely advisory. In any event, although they proved insufficient, the suggested measures—implementing certain cleaning procedures and feeding children a diet rich in iron and calcium—cannot be equated with the actions of the city official in
 
 Smullen.
 

 Unlike the blatant hazard in
 
 Smullen,
 
 the hazard in the Harris apartment had ostensibly been abated, as confirmed by a
 
 *205
 
 private company’s inspection in December 1996. Thus, the lead paint hazard would not have been readily apparent.
 

 m
 

 In conclusion, we cannot adopt plaintiffs’ argument without expanding the boundaries of special relationships under our decisional law. As we stated in
 
 Lauer
 
 (95 NY2d at 100), courts have been cautious about opening the public purse. Of course, the Legislature may extend the orbit of duty, but it has not done so. Most of this Court’s special relationship cases have in common that the government is potentially open to liability even though it did not directly cause the plaintiffs injuries. For example, in the police cases (which all but occupy the special relationship field) the police were not directly responsible for the plaintiffs’ injuries.
 
 [10]
 
 Similarly, the fire department in
 
 Helman
 
 (67 NY2d 799 [1986]) did not cause the fire, much as the inspectors in
 
 Garrett
 
 (58 NY2d 253 [1983]) and
 
 O’Connor
 
 (58 NY2d 184 [1983]) did not cause the conflagrations. In this sense municipal responsibility is different from—and a less obvious basis for liability than—instances in which the government employee directly causes the injury, as where a police officer negligently shoots or otherwise injures someone.
 
 [11]
 

 In the special relationship cases we are generally asked to impose liability on the government because it failed to prevent the acts of third persons who are the
 
 primary
 
 wrongdoers. This involves a form of secondary liability which we have restricted, out of respect for the public treasury. While, on occasion, the government’s failure to act is so severe as to render it liable, no government could possibly exist if was made answerable in dam
 
 *206
 
 ages whenever it could have done better to protect someone from another person’s misconduct. Illustrations (and damages) would be infinite, varying only in the degree of harm. Here, the municipalities are not charged with having caused the lead paint injuries. If that were the case, as where the municipality owned the premises, it would be answerable to same extent as any other owner or landlord.
 
 [12]
 

 Accordingly, in each case the order of the Appellate Division should be affirmed, with costs.
 

 Chief Judge Kaye and Judges G.B. Smith, Ciparick, Graffeo, Read and R.S. Smith concur.
 

 In each case: Order affirmed, with costs.
 

 [1]
 

 . The nonmunicipal defendants are not involved in either of these appeals.
 

 [2]
 

 . Under the Putnam County protocols, children who have blood lead levels at or above 10 mcg/dl are entered into the Health Department case management system.
 

 [3]
 

 . New York City Health Code (24 RCNY) § 173.13 (d) (2), defines lead poisoning as blood lead levels of 20 mcg/dl or higher.
 

 [4]
 

 .
 
 See
 
 Rechtschaffen,
 
 The Lead Poisoning Challenge: An Approach for California and Other States,
 
 21 Harv Envtl L Rev 387 (1997);
 
 see also
 
 Jensen,
 
 From Tobacco to Health Care and
 
 Beyond—A
 
 Critique of Lawsuits Targeting Unpopular Industries,
 
 86 Cornell L Rev 1334, 1364-1371 (Sept. 2001).
 

 [5]
 

 . We note that the City recently enacted Local Law No. 1 of 2004, the New York City Childhood Lead Poisoning Prevention Act of 2003 (Proposed Intro No. 101-A), to become effective August 2, 2004.
 

 [6]
 

 .
 
 See Becker v City of New York,
 
 2 NY2d 226 (1957);
 
 Bemardine v City of New York,
 
 294 NY 361, 365 (1945).
 

 [7]
 

 .
 
 See Motyka v City of Amsterdam,
 
 15 NY2d 134 (1965);
 
 Weiss v Fote,
 
 7 NY2d 579 (1960);
 
 see generally
 
 Stewart F. Hancock, Jr., Symposium: Municipal Liability,
 
 Municipal Liability Through a Judge’s Eyes,
 
 44 Syracuse L Rev 925 (1993).
 

 [8]
 

 . While the existence of a special relationship depends on the facts, a plaintiff has a heavy burden in establishing such a relationship. As a result, we have dismissed most such claims as a matter of law
 
 (see e.g. Lauer,
 
 95 NY2d 95 [2000] [complaint dismissed after judgment for plaintiff];
 
 Merced v City of New York,
 
 75 NY2d 798 [1990] [complaint dismissed];
 
 Kircher v City of Jamestown,
 
 74 NY2d 251 [1989] [summary judgment];
 
 Cuffy v City of New York,
 
 69 NY2d 255 [1987] [complaint dismissed after judgment for plaintiff];
 
 Helman v County of Warren,
 
 67 NY2d 799 [1986] [summary judgment];
 
 Year-wood v Town of Brighton,
 
 64 NY2d 667 [1984] [complaint dismissed after judgment for plaintiff];
 
 Quinn v Nadler Bros.,
 
 59 NY2d 914 [1983] [summary judgment];
 
 O’Connor v City of New York,
 
 58 NY2d 184 [1983] [complaint dismissed after judgment for plaintiff];
 
 Weiner v Metropolitan Transp. Auth.,
 
 55 NY2d 175 [1982] [summary judgment];
 
 Malerba v Incorporated Vil. of Huntington Bay,
 
 54 NY2d 863 [1981] [summary judgment];
 
 Sanchez v Village of Liberty,
 
 42 NY2d 876 [1977] [complaint dismissed for failure to state cause of action];
 
 Pinkney v City of New York,
 
 40 NY2d 1004 [1976] [affirming dismissal of complaint at close of evidence];
 
 Evers v Westerberg,
 
 32 NY2d 684 [1973] [affirming dismissal of complaint against municipality after verdict for plaintiff];
 
 Bass v City of New York,
 
 32 NY2d 894 [1973] [affirming dismissal of complaint after judgment for plaintiff];
 
 Riss v City of New York,
 
 22 NY2d 579 [1968] [affirming dismissal at close of evidence];
 
 Motyka v City of Amsterdam,
 
 15 NY2d 134 [1965] [affirming dismissal of complaint at close of plaintiff’s case]).
 

 In several of the most egregious situations, we sustained judgments for plaintiffs or found questions of fact precluding summary judgment
 
 (see e.g. Mastroianni v County of Suffolk,
 
 91 NY2d 198 [1997] [reversing grant of summary judgment for defendant];
 
 Sorichetti v City of New York,
 
 65 NY2d 461 [1985] [affirming judgment for plaintiff];
 
 De Long v County of Erie,
 
 60 NY2d 296 [1983] [affirming judgment for plaintiff];
 
 Garrett v Holiday Inns,
 
 58 NY2d 253 [1983] [reversing grant of summary judgment for municipality];
 
 Florence v Goldberg,
 
 44 NY2d 189 [1978] [affirming judgment for plaintiff];
 
 Smullen v City of New York,
 
 28 NY2d 66 [1971] [reinstating judgment for plaintiff];
 
 Schuster v City of New York,
 
 5 NY2d 75 [1958] [reversing dismissal of complaint];
 
 see also Crosland v New York City Tr. Auth.,
 
 68 NY2d 165 [1986] [affirming denial of defendant’s summary judgment motion]).
 

 [9]
 

 . Other courts, both state and federal, have addressed municipal liability in lead paint cases. Some have held that plaintiffs raised triable issues of fact based on special relationships (see
 
 e.g. Carrero v New York City Hous. Auth.,
 
 295 AD2d 230 [1st Dept 2002];
 
 Curry v Davis,
 
 241 AD2d 924 [4th Dept 1997];
 
 Bargy v Sienkiewicz,
 
 207 AD2d 606 [3d Dept 1994];
 
 Cardona v County of Albany,
 
 188 Misc 2d 440 [Sup Ct, Albany County 2001]; see
 
 also Valencia v Lee,
 
 123 F Supp 2d 666 [ED NY 2000],
 
 vacated on jurisdictional grounds
 
 316 F3d 299 [2d Cir 2003]).
 

 Other courts have granted summary judgment to the municipality because the plaintiffs did not establish a special relationship (see
 
 Gibbs v Paine,
 
 280 AD2d 517 [2d Dept 2001];
 
 Ubiera v Housing Now Co.,
 
 184 Misc 2d 846 [Sup Ct, Bronx County 2000]).
 

 [10]
 

 .
 
 See Mastroianni,
 
 91 NY2d 198 (1997);
 
 Merced,
 
 75 NY2d 798 (1990);
 
 Kircher,
 
 74 NY2d 251 (1989);
 
 Cuffy,
 
 69 NY2d 255 (1987);
 
 Sorichetti,
 
 65 NY2d 461 (1985);
 
 Yearwood,
 
 64 NY2d 667 (1984);
 
 De Long,
 
 60 NY2d 296 (1983);
 
 Weiner,
 
 55 NY2d 175 (1982);
 
 Malerba,
 
 54 NY2d 863 (1981);
 
 Florence,
 
 44 NY2d 189 (1978);
 
 Evers,
 
 32 NY2d 684 (1973);
 
 Bass,
 
 32 NY2d 894 (1973);
 
 Riss,
 
 22 NY2d 579 (1968);
 
 Schuster,
 
 5 NY2d 75 (1958);
 
 see also Shinder v State of New York,
 
 62 NY2d 945 (1984);
 
 Napolitano v County of Suffolk,
 
 61 NY2d 863 (1984);
 
 see generally
 
 1 Dobbs, Torts § 272, at 728-731 [2001]; 18 McQuillin, Municipal Corporations § 53.04.25, at 193-197; § 53.04.30, at 209-213 [3d ed rev]; Annotation,
 
 Liability of Municipality or Other Governmental Unit for Failure to Provide Police Protection from Crime,
 
 90 ALR5th 273.
 

 [11]
 

 .
 
 See Jones v State of New York,
 
 33 NY2d 275 (1973);
 
 Flamer v City of Yonkers,
 
 309 NY 114 (1955);
 
 Bernardine v City of New York,
 
 294 NY 361 (1945);
 
 see generally
 
 Annotation,
 
 Municipality Liability for Personal Injuries Resulting From Police Officer’s Use of Excessive Force in Performance of Duty,
 
 88 ALR2d 1330.
 

 [12]
 

 .
 
 See e.g. Miller v State of New York,
 
 62 NY2d 506 (1984);
 
 Preston v State of New York,
 
 59 NY2d 997 (1983).