OPINION OF THE COURT
Melvin L. Schweitzer, J.
This is the court’s decision on liability after a five-day trial (July 13-17, 2009) which followed the court’s earlier summary judgment decision (November 26, 2008) where the court dismissed claimants’ fraud and breach of contract claims, but denied defendant’s motion for summary judgment with respect to claimants’ negligence claim.
The claim arises from the professional boxing match between junior welterweight fighters, Joey Gamache and Arturo Gatti on February 26, 2000 at Madison Square Garden, televised by HBO. The bout was the co-featured prelude that evening to a high-profile welterweight match between Oscar De La Hoya and Derrell Coley. The bout was authorized and fought under the supervision of the New York State Athletic Commission (Athletic Commission or Commission). Mr. Gamache entered the ring with a record of 55 wins (38 by knockout), three losses and was ranked as one of the top boxers in the world in several weight divisions. Mr. Gatti, a former junior lightweight world champion had a record of 30 wins (25 by knockout), four losses. Mr. Gatti knocked out Mr. Gamache early in the second round and Mr. Gamache sustained head injuries that ended his boxing career.
Mr. Gamache alleges here that the official weigh-in for the bout, conducted by Athletic Commission officials on the day before the fight, was done negligently. The fighters had contracted to weigh no more than 141 pounds. According to Mr. Gamache, Mr. Gatti did not make this contract weight, yet despite objections at the weigh-in from the Gamache camp that he did not, Mr. Gatti was allowed by the Athletic Commission to fight anyway. Mr. Gamache asserts that the result of the Commission’s failure to enforce the applicable contract weight at the weigh-in was that Mr. Gatti then was able to rehydrate and further nourish himself in the ensuing 30 hours before the bout, and thus came into the ring weighing approximately 20 pounds over the prescribed weight for the fight, three or four weight classifications above the junior welterweight category they were fighting in. The weight mismatch, according to Mr. Gamache, *991 enabled Mr. Gatti to land punches that were far more powerful, and thus damaging, which resulted in Mr. Gamache being quickly knocked out and seriously injured. According to Mr. Gamache’s counsel in his opening statement: “This case is not about a mismatch of skill. It’s about a mismatch of the size that came about as a direct result of the State’s failure to uphold their rules and regulations.”
Defendant counters that the Athletic Commission properly conducted the weigh-in, and that Mr. Gatti did make the 141-pound weight limit prescribed for the fight. Any subsequent weight gain that Mr. Gatti was able to achieve during the customary rehydration and replenishment period after the weigh-in and before the fight was permissible and is the only explanation for why Mr. Gatti may have appeared bigger and heavier than Mr. Gamache on fight night. Defendant also contends that if Mr. Gamache’s corner believed the weigh-in was not conducted properly, they did not lodge an effective protest at the time. And, finally, defendant disputes that Mr. Gamache was able to prove the knockout was caused by anything other than Mr. Gatti’s boxing and punching prowess.
[The] summary of the testimony of each witness deemed relevant for purposes of the court’s decision [was redacted for purposes of publication].[1] The court’s findings of fact and conclusions of law then are set forth, followed by a discussion of certain aspects of the evidence that bear on the court’s findings.
Findings
The court’s findings of fact and conclusions of law follow.
In this court’s decision denying defendant’s motion for summary judgment (Gamache v State of New York, NYLJ, Jan. 21, 2009, at 26, col 1 [M-74200]), the court concluded that issues of fact existed as to whether the Athletic Commission negligently conducted the ministerial act of weighing Mr. Gatti at the official weigh-in to determine whether he was in compliance with the specified contract weight for the fight; and also that issues of fact existed as to whether the Athletic Commission negligently exercised its discretion by allowing the bout to proceed at all (and letting the fighters use eight-ounce gloves) if there was a weight differential between the two fighters of almost 20 pounds at the time of the fight itself. After this ruling, the New York *992 Court of Appeals decided McLean v City of New York (12 NY3d 194 [2009]), in which it eliminated the possibility that governmental tort liability may be found when official action involves the exercise of discretion by government officials.[2] 3****McLean reaffirmed, however, that the State may be held liable for negligently performing a ministerial act. Negligently performed ministerial acts can subject the State to liability only in the circumstances set forth in McLean, that is, where a special relationship exists. In this court’s summary judgment decision, the court already has found such a relationship to exist here by virtue of the Athletic Commission’s statutory and regulatory relationship with the fighters under its jurisdiction, and that the right of an aggrieved fighter to sue the State in such circumstances may be fairly implied.[3] The court’s findings thus take *993 into account the law as it exists today with regard to discretionary governmental acts, enunciated in McLean.
The court finds that claimants proved by a fair preponderance of the credible evidence that the Athletic Commission, by its officials and employees, violated its duty of care to Mr. Gamache as a licensed boxer under the Commission’s jurisdiction and control, in its performance of the ministerial act of conducting the official weigh-in of Arturo Gatti on February 25, 2000. Claimants proved Mr. Gatti was allowed to get off the scale before it reasonably could be determined that he “made weight,” and, more likely than not, Mr. Gatti weighed in excess of the 141-pound contract weight at the time of the official weigh-in.
The court further finds, however, that claimants failed to prove by a fair preponderance of the credible evidence that the Athletic Commission’s ministerial breach of duty in this regard was the proximate cause of the career-ending defeat and injuries sustained by Mr. Gamache in the fight itself, and thus defendant is not liable to claimants for its negligence.
The court also finds that any other allegedly negligent acts or omissions of the Athletic Commission after the official weigh-in and before the fight were matters entirely within the discretion of Commission officials and employees, and, as a matter of law, cannot be a basis for finding defendant liable here. These are:
(i) Permitting the boxers to enter the ring and fight when it appeared on fight night that Mr. Gatti may have weighed in excess of the 151-pound maximum allowable weight for a junior welterweight boxer. The only weight which counts for purposes *994 of the ministerial decision of determining that boxers have met the contract weight is the weight at the official weigh-in. Thereafter, boxers are permitted to rehydrate, replenish and gain as much weight as they want, subject only to any entirely discretionary decisions the Commission may deem necessary in the interest of the health and safety of the fighters, such as conducting another official weigh-in at fight time. No admissible evidence was introduced as to what Mr. Gatti weighed at the time of the fight itself, and claimant did not prove by a fair preponderance of the credible evidence that Mr. Gatti weighed in excess of 151 pounds at the official weigh-in.
(ii) Allowing the boxers to use eight-ounce gloves, instead of 10-ounce gloves with more padding, when it appeared on fight night that Mr. Gatti may have weighed in excess of 154 pounds. Again, the only weight that counts is the weight at the official weigh-in, and any other gloving decisions that may be predicated on perceived weight increases which occurred after the official weigh-in were matters entirely within the discretion of Commission officials.
Discussion
A discussion of certain aspects of the evidence as they bear on the court’s findings follows.
Something very much out of the ordinary appears to have happened at the official weigh-in for the Gatti-Gamache fight. The court’s view of the evidence is that, more likely than not, Athletic Commission officials were lax in the performance of their responsibilities to ascertain that Mr. Gatti made the contract weight of 141 pounds for this high-profile, HBO-televised preliminary bout.
The backdrop for the weigh-in is worthy of note. According to Mr. Bosdal [Mr. Gamache’s manager], at the time of the contract negotiations for the bout, Mr. Gamache actually was the “bigger” fighter, fighting at a contract weight of 147 pounds. He had not fought at 141 pounds for three or four years. He wanted to fight at 147 because he wanted both fighters to come in “big,” as he said, closer to where their natural weight was, but Mr. Gatti’s camp refused. Mr. Gatti had been fighting at a 141-pound contract weight and his promoter insisted on that weight for this bout. Mr. Gatti’s walk-around weight was approximately 170 and Mr. Gamache weighed approximately 158 when he started training for this fight. Mr. Glenn [Mr. Gamache’s trainer] believed it would be tough for both fighters to get down to 141, but that it would be harder for Mr. Gatti, given his lifestyle.
*995 There was testimony that in Mr. Gatti’s previous bout, he showed the ability to put on considerable weight quickly through rehydration and by eating numerous meals between the weigh-in and the fight itself. During the training period for this bout, Mr. Bosdal heard from sources that Mr. Gatti was indeed having trouble losing weight, and he conveyed his concern to Mr. Duffy [Coordinator of Boxing for the Commission]. Mr. Duffy even suggested to Mr. Bosdal that the Athletic Commission, on request, might delay the weigh-in until fight day, but Mr. Bosdal declined to pursue this because he wanted his fighter, as well, to have sufficient time to be able to rehydrate and replenish his body. Mr. Skowronski [Mr. Gatti’s trainer] testified that on the afternoon of the weigh-in Mr. Gatti was still in a gym working to sweat off the remaining few pounds in a plastic suit. It is reasonable to infer that Mr. Duffy, who already had been put on notice by Mr. Bosdal that Mr. Gatti might have a weight problem, was alert to this possibility.
Adding to the drama of what should have been a routine, prefight event staged primarily for the media, was that this weigh-in day coincided with the news that an Albany jury had rendered its verdict in the racially charged Amadou Diallo trial. New York City was tense that day, and the customary Madison Square Garden security assigned to weigh-ins had been deployed elsewhere. Then, the weigh-in for the co-featured De La HoyaColey bout engendered its own controversy when Mr. Coley charged that Mr. De La Hoya had not made the contract weight for their contest and sought out the media to make his case. According to Mr. Southard [Chair of the Commission], because of the rising tensions, HBO, which was televising the weigh-in, was rushing things and “wanted to get the hell out of there, too.” The Gatti-Gamache weigh-in followed immediately thereafter.
There is somewhat conflicting testimony on how Mr. Russo [Executive Director of the Commission], who had relatively little experience conducting weigh-ins, came to be the one who conducted both of the weigh-ins that day. Mr. Southard testified that Mr. Russo had not been selected to do them initially. Messrs. Southard and Duffy were delayed on their way to Madison Square Garden, however, and when they finally arrived the fighters and Mr. Russo, along with the promoters and the media, were already in the vicinity of the scale and the De La HoyaColey weigh-in was about to begin. Mr. Duffy was expecting to conduct the weigh-ins as usual, and Mr. Southard testified that he instructed Mr. Duffy to take over. Mr. Duffy, by far, was the *996 most experienced in conducting weigh-ins, having conducted over 3,000. But, according to Mr. Southard, Mr. Duffy declined to step forward because Mr. Russo already was in place at the scale. Mr. Duffy’s account, on the other hand, is that when he entered the room, Mr. Russo, his superior as the Commission’s Executive Director, actually told him he would do the weigh-ins that day, and Mr. Duffy thus deferred to him. Mr. Russo’s deposition testimony on this point is not helpful. He said he could not recall whether it was he or Mr. Southard who actually conducted the Gatti-Gamache weigh-in, demonstrating either a lack of recollection or a lack of candor. Mr. Duffy stayed in the area nonetheless as he felt he had responsibility for the process as a Commission official.
Although it appears there is no official protocol for how to conduct a weigh-in, Mr. Duffy and Mr. Southard concurred on the more appropriate way to do one. Before anyone is weighed, the counterweights on the scale are moved to zero to be sure the bar levels out and the scale is functioning properly. This is called “zeroing out.”[4] They differed, however, on whether this is done only once, before any weigh-ins for the day are conducted *997 (Mr. Duffy), or whether this is done after each set of opponents is weighed (Mr. Southard). Both agreed, however, that before the boxers for a particular contest get on the scale, the counterweights are preset to the contract weight for the bout. Both also agreed that one Commission member reads and calls the weight, while another member records it. (Mr. Southard said that at Madison Square Garden events, the Commission had a third person viewing the scale to see that the weight is accurately measured.) Mr. Duffy, whose Commission role over the years included training others at the Commission to do weigh-ins, added that the one who reads and calls the weight is the only one who is supposed to touch the scale. It is clear from the court’s observation of the DVD of the weigh-in that this is not what happened here.
The first matter at issue is whether the scale had been correctly preset to the contract weight of 141 pounds. Everyone agrees this is what was supposed to happen. The DVD begins with Mr. Gatti stepping on the scale, so there is no visual record of what happened before that to set the weight. Mr. Southard said that Mr. Russo was told by someone to set the scale for “junior welterweight,” but after Mr. Gatti stepped on, “somebody” noticed the weight was incorrectly set at 140 pounds instead of the contract weight of 141, and that person “yelled out 141,” after which Mr. Russo adjusted the counterweight accordingly. Mr. Bosdal’s testimony disputes this. He says he actually saw that the counterweight had been correctly set at 141 before Mr. Gatti got on. Although it appears that someone from Mr. Gamache’s camp is saying something in the background, there is nothing on the DVD from which one can conclude that the attention of either Mr. Russo or Mr. Southard had been alerted to anything — let alone a significant error. Their attention remains fixated on the beam. Neither of them appear to *998 have been startled by a yelled correction, nor does Mr. Russo appear to have been responding to one.
What the DVD shows is that after Mr. Gatti stepped on the scale, the beam appears to have moved upward. Several credible witnesses testified that when Mr. Gatti stepped on, the beam actually moved to the very top of the scale. On the DVD, Mr. Southard’s eyes appear at that point to have moved to look at the top of the beam and Mr. Russo’s head turned slightly to the top of the beam as well. Then, Mr. Russo is seen adjusting the counterweight, first slightly higher, then a trifle lower, as Mr. Southard looked on. Mr. Duffy said he saw both Mr. Southard and Mr. Russo adjusting the counterweight to make it slightly heavier. Mr. Russo actually testified that he was certain the weights on the scale never were adjusted while Mr. Gatti was on it. “I’m sure that they weren’t. I’m sure that they weren’t,” he repeated. The DVD shows Mr. Russo doing just that. Of course, Mr. Russo also had testified that he did not even remember that it was he who conducted the weigh-in. (The court notes that Mr. Southard testified Mr. Russo had been a convicted felon, although Mr. Southard said he was unaware of this at the time of the weigh-in.) Mr. Russo’s altogether defensive posture with regard to his conduct of the weigh-in seems to belie the explanation that Mr. Russo moved the counterweight because someone said it had been incorrectly set at 140. Mr. Bosdal’s testimony that the counterweight was correctly set at 141 before the weigh-in began is credited.
The court, in finding claimant has proved it is more likely than not that Mr. Gatti did not make the 141-pound contract weight for the bout, is troubled by the explanation that Mr. Russo initially moved the counterweight after Mr. Gatti got on the scale because “someone” yelled out that the scale had been set incorrectly to 140 pounds. Even if it were to be credited, according to the testimony of both Mr. Duffy and Mr. Southard, presetting the contract weight before a weigh-in begins for a bout is an essential part of the procedure, and it behooved the Commission to get it right so that the propriety of the entire weigh-in was not in question. And Mr. Southard was standing right there for the De La Hoya-Coley weigh-in that preceded the Gatti-Gamache one. The significance, of course, is that if, in fact, the scale was set properly at 141 pounds before Mr. Gatti stepped on it (as it should have been), then the only reason to have moved the counterweight after Mr. Gatti got on was because it was clear he had not made the contract weight. Mr. *999 Glenn testified that Mr. Southard’s readjustment after Mr. Gatti got off the scale and before Mr. Gamache got on was that the counterweight had been moved above 141 during the Gatti weigh-in to try for balance.
Regardless of why the counterweight was moved, the DVD next shows that after this was done the beam remained in an upward slant. It was not until Mr. Russo instructed Mr. Gatti to raise his arms in the air that the beam appears to have begun to float downward (also confirmed by witnesses). They testified that when fighters raise their arms on the scale, this is what happens. Mr. Russo, on the other hand, said he told Mr. Gatti to raise his arms in order to “steady the scale,” and that it balanced after that. In the court’s view, Mr. Russo appears to have called Mr. Gatti’s weight at 141 pounds before the needle came to a rest, and his premature call allowed Mr. Gatti to quickly get off the scale. This was akin to a “fast shuffle,” and only compounded the misdeeds.
Mr. Bosdal and Mr. Glenn objected that the needle had not settled in the middle of the scale. Mr. Russo brusquely dismissed their objections. Next, Mr. Southard is seen on the DVD adjusting the counterweight on the scale before Mr. Gamache got on, first up and then a trifle down. He testified he was not resetting the contract weight at 141 for Mr. Gamache, but rather confirming that it already was set properly. He said he did this because it was his nervous habit to make sure the contract weight was set correctly. In Mr. Duffy’s view, Mr. Southard’s touching the scale was clearly inappropriate as he was not the official conducting the weigh-in. He found this to be inexplicable.
Mr. Hirsch [a writer for Preakness Boxing News, he had followed Mr. Gamache during his preparation for the contest with Mr. Gatti] testified that even Mr. Russo ultimately admitted to him several months later that it would have been a good idea to reweigh Mr. Gatti. Mr. Southard testified this was the last weigh-in Mr. Russo was allowed to conduct for the Commission. Mr. Duffy said the weigh-in was not conducted in a proper manner and told Mr. Gelfand it was an embarrassment. In the court’s view, based on the testimony and its review of the DVD of the weigh-in, what transpired was worse than that.
These serious departures from a standard of reasonable care notwithstanding, it remains black letter law that proof of negligence, by itself, is not enough to establish liability for negligent misconduct; it also must appear that defendant’s act or omission was a proximate cause of Mr. Gamache’s injury. (Burgos v Aqueduct Realty Corp., 92 NY2d 544, 550 [1998].)
*1000 Although claimants proved it was likely that Mr. Gatti did not make weight at the official weigh-in, they did not prove he weighed substantially in excess of 141 pounds at the official weigh-in — certainly not in excess of 151 pounds, which automatically would have disqualified him from fighting as a junior welterweight. The court, having carefully reviewed the DVD of the weigh-in, finds that, at most, Mr. Gatti weighed marginally more than 141 pounds, no more than a few pounds heavier. The DVD shows Mr. Russo adjusting the counterweight only slightly. And when Mr. Gatti was instructed to raise his arms in the air, the beam did begin to float downward from the top of the scale. Absent any proof on the question, common sense permits a reasonable inference that had Mr. Gatti weighed substantially in excess of 141 pounds, the beam would not have floated down at all when he raised his arms, but would have stayed fixed at the top.
Also, the failure of Messrs. Bosdal and Glenn to pursue their objections to the careless manner of the weigh-in permits a reasonable inference that they believed Mr. Gatti’s weight to have been only marginally greater than 141 pounds. It is understandable that the Gamache camp, having been pressured by Mr. Gatti and his promoter to agree to a contract weight of 141 pounds (instead of his preferred contract weight of 147 to which he had been accustomed to fighting for the past four years), was incensed at the weigh-in when he had worked so hard to make this new weight, yet Mr. Gatti received what appeared to be a “pass” even though he had missed the 141-pound mark. Thereafter, having suffered this defeat which ended his career, Mr. Gamache apparently believed he actually had been defrauded by Mr. Gatti and the Commission (the court dismissed his fraud claim for failure to state a cause of action). As it turned out, it very well may be that Mr. Gamache’s decision to contract at the 141-pound weight, to which he was not accustomed, may have required him to so deplete himself during the weight-loss process that it somehow may have adversely affected his customary ability to effectively defend in the bout. (Mr. Glenn, his trainer, acknowledged that his fighter had not adequately defended some of Mr. Gatti’s direct punches.) But it was Mr. Gamache, initially, who wanted this bout and was willing to do this, and notwithstanding the marginal weight disparity at the official weigh-in, his camp still believed he was the better boxer and would win in any event. So while they were upset at the manner in which the weigh-in was conducted and voiced their immediate concerns, *1001 asking that Mr. Gatti be reweighed, they did nothing to formally press their objection further, such as having Mr. Gamache refuse to be weighed or to fight, both of which he had a right to do. From their actions, a reasonable inference may be drawn that they did not consider the marginal weight infraction as ultimately posing a threat to Mr. Gamache’s health and safety— even as it pertains to the muscle depletion/retention theory claimants pressed at trial (see infra) and even in the face of the Gamache camp’s awareness of Mr. Gatti’s reputation for being able to regain an enormous amount of weight during the 30-hour rehydration and replenishment process before a fight.
From the court’s review of the DVDs of both the weigh-in and the next night’s fight, as well as the testimony of other witnesses including Mr. Gamache, Mr. Gatti did appear much larger and more muscular than Mr. Gamache at the fight itself than he appeared at the weigh-in. But he also appeared to be the better boxer that night. The force of the punishing blows to the head that Mr. Gamache absorbed on fight night may have been due to a number of factors, such as Mr. Gatti’s punch velocity and angle, his apparent four-inch reach advantage (according to Fight Fax), Mr. Gatti being six years younger than Mr. Gamache, and Mr. Gamache’s inability to effectively defend that night. It appeared that Mr. Gamache did not block the blows that knocked him out. To be sure, the fact that Mr. Gatti may have been substantially heavier than Mr. Gamache at fight time also may have contributed. But this was a function of the rehydration and replenishment that both fighters were allowed to engage in to lessen their chances of brain injury, not because Mr. Gatti started out marginally heavier at the official weigh-in.
Claimants contend that if Mr. Gatti weighed more than 141 pounds, it follows that he did not have to deplete himself of muscle strength to the same extent as did Mr. Gamache, and that Mr. Gatti thus had a head start on the post-weigh-in rehydration and replenishment process and did not have to rebuild as much muscle as did Mr. Gamache. They point to the testimony of expert witnesses Dr. Folk and Dr. Jordan, both of whom testified that, physiologically, the weight-loss process progresses from water first, followed by fat, and finally, muscle weight. The testimony was that it is hard and painful to lose the final pound or ounces of weight. Mr. Bosdal described the process of losing those last few pounds or ounces as “death.” Dr. Folk opined that Mr. Gatti could not have rebuilt his muscles in 30 hours. Claimants assert that this is what made the crucial *1002 difference in the relative strength of the fighters at fight time. But Dr. Jordan countered that a fighter whose normal weight is considerably heavier than his contract weight actually may lose more muscle weight than a lighter fighter. Mr. Gatti’s walk-around weight was considerably heavier than Mr. Gamache’s.
Whatever surface appeal claimants’ argument may present, the court finds they failed to prove it. The testimony about loss of muscle weight addressed the subject in general terms. No proof was offered concerning the muscle weight of these specific fighters at any point in time. Nor, for that matter, was any proof offered as to when muscle weight loss first begins or accelerates. Based on the record here, there simply is no way for the court to find that the faulty weigh-in was a “substantial” contributing factor in bringing about Mr. Gamache’s injury. (See Derdiarian v Felix Contr. Corp., 51 NY2d 308, 315 [1980].)
Claimants also argue that, regardless of the head start Mr. Gatti may have received on the rehydration and replenishment process, it is only because the Commission turned a blind eye to his failure to make the contract weight that Mr. Gatti was able to enter the ring at all. In the court’s view, this effort to find a direct nexus between Mr. Gatti’s having marginally exceeded the contract weight at the weigh-in and the damage sustained by Mr. Gamache on fight night is far too speculative to satisfy the legal standard for the alleged proximate cause of Mr. Gamache’s injuries. (Mitchell v Mongoose, Inc., 19 AD3d 380, 381 [2d Dept 2005] [“as proximate cause may be inferred from the facts and circumstances underlying the injury, the evidence must be sufficient to permit a finding based on logical inferences from the record and not upon speculation alone” (citations omitted)].) Claimants had the burden to show that “other causes [of Mr. Gamache’s injuries were] sufficiently ‘remote’ or ‘technical’ to enable [the court to reach its decision] not upon speculation, but upon the logical inferences to be drawn from the evidence” (Schneider v Kings Hwy. Hosp. Ctr., 67 NY2d 743, 744 [1986]). Here, the court cannot do this; it cannot rule out that Mr. Gamache’s knockout and injuries resulted from causes inherent in the danger of boxing referenced supra, e.g., the velocity and angle of Mr. Gatti’s punches, his reach advantage, Mr. Gatti being considerably younger, and Mr. Gamache’s own inability to effectively defend that night. In these circumstances, an inference that Mr. Gamache’s injuries were caused by the marginal disparity between the contract weight for the bout and what Mr. Gatti actually weighed at the official weigh-in is simply *1003 unwarranted. Although the faulty weigh-in may have furnished the occasion for Mr. Gamache’s injuries, that is insufficient to find it proximately caused them. (See e.g. Penovich v Schoeck, 252 AD2d 799 [3d Dept 1998] [landlord’s failure to remove ice from roof was not proximate cause of plaintiffs injuries when he fell off while climbing down from roof after cleaning off ice]; Quiroz v Edelman of N.Y., 224 AD2d 509 [2d Dept 1996] [sale of firearm merely condition for occurrence, not the proximate cause]; Benaquista v Municipal Hous. Auth. of City of Schenectady, 212 AD2d 860 [3d Dept 1995] [landlord’s failure to repair intercom not the proximate cause of plaintiffs injury when she went downstairs to admit visitor].)
What remains to be briefly addressed pertains to the Athletic Commission’s decisions after the weigh-in and before the fight itself, that is, its having permitted the fight to proceed when it appeared at fight time that Mr. Gatti may have weighed substantially more than Mr. Gamache and in excess of the 151-pound maximum allowable weight for a junior welterweight, and its having permitted the fighters to use eight-ounce gloves in this circumstance.
Mr. Gatti was not officially reweighed by the Commission on the day of the fight, so his weight when he stepped into the ring is entirely a matter of speculation. Mr. Gamache testified that when he saw Mr. Gatti in the ring, Mr. Gatti appeared so large that he mistook him for Mr. Gatti’s brother, a boxer who fought in a heavier weight class. Other witnesses testified they observed Mr. Gatti either at the contest or on a DVD recording of the contest and concluded that he appeared much larger than Mr. Gamache. Mr. Southard, on the other hand, said he thought Mr. Gatti only appeared taller than at the weigh-in. Mr. Bosdal testified that some unidentified person told him immediately prior to the contest that at an unofficial weigh-in conducted by HBO earlier that day, Mr. Gatti weighed 161 pounds. But this is pure hearsay.
The decision whether to stop a fight from taking place in the interest of the health and safety of the boxers is entirely within the discretion of the Athletic Commission. Here, at the time of the fight, the Commission knew its call of Mr. Gatti’s weight at the official weigh-in already had engendered controversy. Although none of the Commission witnesses who testified at trial said they knew of the results of the HBO unofficial weigh-in before the fight, Commission members at ringside saw what everyone else did concerning Mr. Gatti’s apparent larger size *1004 when Mr. Gatti entered the ring and removed his robe. If any of them felt the bout may have presented a dangerous weight mismatch after the rehydration and replenishment process, the Commission had the authority to order another official weigh-in and to take whatever other action it deemed appropriate, including cancelling the fight, if necessary. (See Fitzsimmons v New York State Athletic Commn., 15 Misc 2d 831, 832 [Sup Ct, NY County 1914], affd 162 App Div 904 [1st Dept 1914] [Commission barred a boxer incapacitated by age and physical condition from competing in a boxing contest].) Indeed, as this court found in its decision denying summary judgment, the Athletic Commission’s special relationship to the licensed fighters under its jurisdiction charges the Commission with this responsibility. In the circumstances here, however, this was a judgment call entirely within the discretion of the Commission. And, as such, under the Court of Appeals decision in McLean v City of New York (supra), decided after this court’s summary judgment decision finding a special relationship, potential tort liability for an alleged negligent exercise of that discretion, or failure to exercise it, does not exist.
So, too, with regard to selecting the weight of the boxing gloves for the bout: According to Athletic Commission custom and practice, the selection of boxing glove weight is ministerially determined by the weight of the fighters at the official weigh-in. Fighters weighing in excess of 154 pounds must wear 10-ounce gloves with more padding, and those below that weight need not. As the court has found that at the time of the official weigh-in, Mr. Gatti weighed no more than a few pounds in excess of 141, there was no violation of the Commission’s custom and practice with regard to the gloves, viz., the weight of the fighters at that time. And because Mr. Gatti was not officially reweighed on the day of the fight, his actual weight at fight time remains purely a matter of conjecture. Although the Commission may order gloves of a different weight at any time before a fight (as when the fighters and their promoters agree at the outset in their contract to use the higher weight or, apparently, if the Commission deems it prudent for some other reason), no one from the Gamache camp raised the matter of glove weight on the day of the fight. In any event, this, again, is entirely within the Commission’s discretion and, thus, not actionable under McLean.
Mr. Gamache fought Mr. Gatti on February 26, 2000 and absorbed punishing blows to the head prior to being knocked *1005 out early in the second round. This is what caused the damage Mr. Gamache suffered in this contest, not, as claimants allege, that Mr. Gatti weighed a few pounds marginally in excess of 141 at the time of the official weigh-in. Claimants’ reliance on a “but for” theory to justify their claim is misplaced under the law of negligence in New York. Accordingly, defendant has no liability to claimants arising out of the Gatti-Gamache contest.
Let judgment enter for the defendant dismissing the claim herein.
[Portions of opinion omitted for purposes of publication.]

. On July 11, 2009, two days before this trial began, Mr. Gatti, who was listed as a witness by both sides, was found dead at a seaside resort in Brazil. There is no evidence that this tragic event was related to the trial in any way.

. See, however, the concurring opinion of Chief Judge Lippman in a later decision, Dinardo v City of New York (13 NY3d 872, 876-877 [2009]), criticizing the McLean decision because “the broad immunity recognized for discretionary acts should not extend to situations where a special relationship is present.”

. The court stated:
“In 1920, the so-called Walker Boxing Law was enacted which further strengthened the Athletic Commission’s authority to provide for ‘rigid supervision ... of all who participate . . . and of the methods of conducting the matches.’ Judge Fuld noted,
‘[t]he statute itself reflects a high concern for the physical fitness of the fighters scheduled to engage in the matches. Such fitness will, of course, enhance the competitive character of the contest and it may be fairly assumed that the Legislature was at least as concerned with the physical welfare of the contestants themselves.’
“The Athletic Commission, accordingly, has been ‘vested with sole discretion, management, control and jurisdiction’ of boxing contests and ‘over all licenses to any and all persons’ who participate in such contests (Title 25 of McKinney’s Unconsolidated Laws of NY § 8906). In furtherance of this authority, the Commission promulgated rules governing them. (19 NYCRR Ch VII). . . .
“The Walker Boxing Law, as amended through the years, clearly establishes a direct relationship between the Athletic Commission and the boxers it licenses, from the time a match is proposed through the fight and its aftermath. Unlike the lead paint regulations in [Pelaez] v. Seide, 2 NY3d 186 (2004), the regulatory regime for boxing is not simply a program ‘of oversight in which the role of government is, in the main, administrative and advisory’ (Id. at 201), but rather one where the regulatory body is directly responsible for a specific bout between two fighters. . . . Each boxer is required by the regime to have on-going direct contact with the Athletic Commission throughout, from the time each signs the Athletic Commission’s required form of contract, *993 to the time each steps on the scale to be weighed by the Athletic Commission’s representative, to the time each dons gloves under the direct supervision of that representative in his dressing room, to the time the representative tells each fighter he may leave that room to proceed to the ring for the fight. At any point along the way and until the Athletic Commission-appointed ring officials — independent contractors — assume responsibility for the conduct of the bout itself, the Athletic Commission and its agents are in direct control of everything that happens. The Athletic Commission’s representatives are seated at ringside and its inspectors have reserved places in each boxer’s corner (§ 209.36). If any regulatory regime can be said to be within that narrow class of cases in which a duty runs from a governmental entity directly to a benefitted class, and where the law is best read to assure that government must be made to bear ultimate responsibility for ensuring compliance with the statutory and regulatory mandates (Pelaez v. Seide, supra, at 201), this is it.” (Gamache v State of New York at 27, col 2 [citation omitted].)

. Claimants contend the State failed in its duty to ensure the proper calibration and approval of the official scale used for the weigh-in. They have the burden to prove the scale was mishandled or miscalibrated, however, and the court finds they have not done so. Mr. Gelfand [Senior Vice-President, Communications, at SCP Worldwide, a sports entertainment and media company; prior to joining SCP Worldwide, he was Vice-President, Public Relations for Madison Square Garden Networks and Sports; he was present at Mr. Gatti’s weigh-in] and Mr. Duffy testified that the Commission’s official scale is stored in the custody of Madison Square Garden. Mr. Gelfand explained that whenever there was a scheduled fight, the scale is calibrated by the Garden at the beginning of the week of the fight so that fighters can come to the Garden during the week to check their weight on the official scale whenever they desire. Then, the scale is calibrated by the Garden again just prior to the official weigh-in. Mr. Southard testified that it was the Commission’s responsibility to calibrate the scale, and Mr. Duffy said this was done by a Commission representative approximately only once every six months, although he personally saw to it that the scale balanced at zero before every official weigh-in. In the court’s view, this general division and delegation of custodial, security and calibration responsibilities by the Commission to Madison Square Garden, a private, interested party, does not present a paradigm of good order, but there are gaps in the proof as they pertain to this specific weigh-in which render untenable a finding of negligence on this basis.
Mr. Gamache and Mr. Bosdal both testified that on the day of this weigh-in, about an hour before it took place, they came to the Garden because they mistakenly thought Mr. Gamache was to be interviewed there by HBO. While there, Mr. Gamache weighed himself on the official scale and was perplexed to see his weight registered at only 137 pounds, clearly indicating the scale was *997 not properly calibrated at that time. Mr. Bosdal notified Mr. Duffy, and someone from the Garden came to recalibrate it. Mr. Gamache then reweighed himself before leaving the premises with Mr. Bosdal and was satisfied that the calibration of the scale had been corrected. There is no further testimony regarding what was done with the scale in the hour between the time the two left the premises and the official weigh-in. Accordingly, it is not known whether the scale was moved after they left or whether the room was properly guarded, or even whether the scale was taken to a different room for the official weigh-in and recalibrated again. Also, Mr. Gamache seemed satisfied with his own weight when officially called at the weigh-in. In the absence of any evidence to prove the mishandling or miscalibration of the scale, the court cannot find defendant negligent for an alleged failure to calibrate the scale properly.