Cody H. v State of New York (2025 NY Slip Op 25162)

[*1]

Cody H. v State of New York

2025 NY Slip Op 25162

Decided on June 16, 2025

Court Of Claims 

Calderon, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the printed Official Reports.

Decided on June 16, 2025
Court of Claims 

Cody H. and BRITTANY H., Individually and as parents and natural guardians of A.H., an Infant, Claimants,

against
The State of New York, Defendant.

Claim No. 137291

For Claimants:
STEVE FOLEY LAW
By: Stephen R. Foley, Esq.
For Defendant:
LETITIA JAMES, Attorney General of the State of New York
By: Michael T. Feeley, Assistant Attorney General

Francisco Calderon, J.

The tragic facts of this case are largely undisputed. In March 2021, claimant Brittany H. gave birth to her and claimant Cody H.'s first child, claimant A.H. Shortly thereafter, a blood sample was taken from A.H. for the State's Newborn Screening Program—an initiative started by the state in the 1960s that now tests for over 50 conditions, including spinal muscular atrophy (SMA). A.H.'s sample screened positive for SMA. However, due to a transcriptional error, A.H.'s pediatrician was sent a report indicating that A.H. did not screen positive for any of the tested conditions. A few months after her birth, A.H. began experiencing the symptoms of SMA and was subsequently diagnosed with such. However, because A.H. did not begin treatment until after her symptoms manifested, the deleterious effects of her condition could not be averted.
Claimants commenced this action, alleging that defendant is negligent for inaccurately relaying the results of A.H.'s screening. Defendant answered, raising 23 affirmative defenses. Claimants now move, following discovery, to strike all of defendant's affirmative defenses. [*2]Defendant opposes the motion and cross-moves for summary judgment to dismiss the claim. Claimants oppose defendant's cross-motion. The parties were permitted to supplement their papers in response to the Court of Appeals' decision in Weisbrod-Moore v Cayuga County (___ NY3d ___, 2025 NY Slip Op 00903 [2025]). The Court heard the parties for oral argument on April 23, 2025. For the reason's stated below, claimants' motion to strike defendant's affirmative defenses is denied and defendant's cross-motion for summary judgment is granted.
FACTUAL BACKGROUND
In support of their motion, claimants submit, among other exhibits, the depositions of Michele Caggana, Brittany H., and Cody H.; the original and corrected reports with A.H.'s screening results; reports generated by the Wadsworth Center in relation to this incident; the brochure about the newborn screening program given to parents; and excerpts from the Wadsworth Center's website.
As stated in her deposition, Dr. Michele Caggana is the Deputy Director for the Division of Genetics, Director of the Newborn Screening Program, and Chief of the Laboratory of Human Genetics at the Wadsworth Center, a division of the Department of Health. Dr. Caggana relayed that the newborn screening program began in 1965 to test for a condition known as phenylketonuria. Since then, the program has expanded to test for numerous disorders that, if discovered early, can be effectively treated. This testing is compulsory pursuant to the Public Health Law absent a religious exception. All parents with newborns receive a brochure explaining what the genetic testing involves and that their doctor will receive a report with the results. The testing is conducted at the Wadsworth Center. Dr. Caggana explained, and as supplemented by the Wadsworth Center's website, that one of the conditions covered by the program is SMA, which is a genetic neuromuscular disorder that can be effectively treated before symptoms develop. If the condition is not uncovered early, a child with SMA will manifest symptoms within a few months and suffer permanent muscle degeneration.
Dr. Caggana first learned of A.H. when she was contacted by a physician treating her who suspected that she had SMA. Dr. Caggana conducted an investigation and discovered that, although A.H. had tested positive for SMA, the control value for the test had been accidentally entered into the results column. Therefore, although A.H. should have screened positive for SMA, she instead received a negative report. After this was uncovered, a new report for A.H. was generated indicating that she was positive for SMA.
While Dr. Caggana stated that the tests are reliable, she also stressed that the screening program is not intended to be a diagnostic test. In other words, even if an infant screens positive for a condition, they should not be diagnosed until follow-up testing is performed by the infant's pediatrician. Both the brochure given to parents and the Wadsworth Center website warn that a negative screen does not necessarily mean an infant will be healthy, with the latter stating that "[p]arents should not be told that a negative screen rules out SMA" (Wadsworth Ctr Website Excerpts, Affirm in Supp of Mot, Exh K, 17 [emphasis in original]). Similarly, the screening report received by pediatricians states that "[t]hese tests are not diagnostic" (Negative Report, id., Exh D, 2).
During her deposition testimony, Ms. H. stated that she brought A.H. to see her pediatrician within one week of her birth. At that time, the pediatrician indicated that A.H. was healthy. However, approximately two months after her birth, the pediatrician began to have concerns about A.H.'s muscular development and recommended that she see a neurologist. Eventually, A.H. was diagnosed with SMA. Ms. H. was told by the physician that, had A.H. [*3]been diagnosed earlier, she likely would not have developed symptoms of SMA. A.H. began treatment shortly after her diagnosis. However, she requires use of a wheelchair, cannot crawl or walk, and cannot transition from one body position to another on her own. She also requires extensive physical therapy every week. Mr. H.'s deposition confirmed Ms. H.'s recounting of events.
Claimants also submitted the affirmation of Abigail Schwaede, M.D., a doctor with board certification in neurology and special qualification in child neurology. Dr. Schwaede averred that, if SMA is diagnosed early, infants can be treated before the onset of symptoms and without negative effects. However, because A.H. was diagnosed after the onset of symptoms, she suffered from permanent neuromuscular deficits that could have been avoided had she started treatment earlier.
In response, defendant submitted an affirmation from Dr. Caggana and the test result from a private laboratory in which A.H. was diagnosed with SMA. In her affirmation, Dr. Caggana provided more information about the screening program. In particular, she stated that New York is one of only two states that does not charge for newborn screening services and that the program is instead funded through a suballocation by the Department of Financial Services, with a 2023-2024 allotment of $14,088,017. Between 205,000 and 227,000 infants are tested each year through the program, resulting in the State reporting around 1.7 million test results over the course of six years. The program began testing for SMA in 2018 following a two-year pilot study.

LAW AND ANALYSIS

Because it is potentially dispositive, the Court will first address defendant's motion for summary judgment to dismiss the claim. The proponent of a motion for summary judgment bears the initial burden of establishing the right to judgment as a matter of law by tendering sufficient evidence, in admissible form, demonstrating the absence of material issues of fact from the case (see Matter of Eighth Jud. Dist. Asbestos Litig., 33 NY3d 488, 496 [2019], citing Alvarez v Prospect Hosp., 68 NY2d 320, 324 [1986]). On such motion, "the facts must be viewed in the light most favorable to the non-moving party and every available inference must be drawn" in favor of the non-moving party (Matter of Eighth Jud. Dist. Asbestos Litig., 33 NY3d 488 at 496 [internal quotation marks and citations omitted]). Once the moving party has demonstrated its prima facie entitlement to summary judgment, the burden shifts to the opposing party to demonstrate the existence of a triable issue of material fact (see Vega v Restani Constr. Corp., 18 NY3d 499, 503 [2012], citing Alvarez, 68 NY2d at 324).
When asserting a common-law negligence claim in New York, a claimant "must demonstrate (1) a duty owed by the defendant to the [claimant], (2) a breach thereof, and (3) injury proximately resulting therefrom" (Ferreira v City of Binghamton, 38 NY3d 298, 308 [2022] [internal quotation marks and citation omitted]). Thus, "[i]n any negligence action, the threshold issue before the court is whether the defendant owed a legally recognized duty to the [claimant]" (Gilson v Metropolitan Opera, 5 NY3d 574, 576 [2005]; see Weisbrod-Moore v Cayuga County, ___ NY3d ___, 2025 NY Slip Op 00903, *1 [2025]). When a negligence claim is asserted against the State, the Court must first determine whether the State's actions were governmental or proprietary. Then, if the actions were governmental in nature, the claimant must demonstrate that the defendant owed them a special duty. If the claimant does so, the defendant may still not be liable if it can prove it is entitled to the defense of governmental immunity.
[*4]A. Governmental or Proprietary Function
On a negligence claim against the State, "the first issue for a court to decide is whether the [State] was engaged in a proprietary function or acted in a governmental capacity at the time the claim arose" (Applewhite v Accuhealth, Inc., 21 NY3d 420, 425 [2013]; accord Tara N.P. v Western Suffolk Bd. of Coop. Educ. Servs., 28 NY3d 709, 713 [2017]). If its actions are proprietary, the State "is subject to suit under the ordinary rules of negligence applicable to nongovernmental parties" and it may not rely on the establishment of a special relationship or governmental immunity (Applewhite, 21 NY3d at 425). A governmental entity's activities are "purely proprietary" when it "substitute[s] for or supplement[s] traditionally private enterprises"; in contrast, a governmental entity "will be deemed to have been engaged in a governmental function when its acts are undertaken for the protection and safety of the public pursuant to the general police powers" (Applewhite, 21 NY3d at 425 [internal quotation marks and citations omitted]). By way of example, a governmental entity that functions in a landlord capacity is acting in a proprietary role (see e.g. Miller v State of New York, 62 NY2d 506, 508 [1984] ["When the State operates housing, it is held to the same duty as private landlords."]; Moore v Del-Rich Props., Inc., 151 AD3d 1817, 1820 [4th Dept 2017] ["It is well established that maintenance and care related to buildings with tenants is generally a proprietary function."]), whereas police and fire protection services are operated in a governmental capacity (see e.g. Valdez v City of New York, 18 NY3d 69, 75 [2011] ["(I)t is undisputed that . . . police protection . . . is a classic governmental, rather than proprietary, function"]); Harland Enters. v Commander Oil Corp., 64 NY2d 708, 709 [1984] ["A fire department is not chargeable with negligence for failure to exercise perfect judgment in discharging the governmental function of fighting fires."]).
However, determining where certain actions fall on the spectrum between proprietary and governmental "may present a close question for the courts to decide" and, therefore, "when the liability of a governmental entity is at issue, it is the specific act or omission out of which the injury is claimed to have arisen and the capacity in which that act or failure to act occurred which governs liability" (Connolly v Long Is. Power Auth., 30 NY3d 719, 728 [2018] [internal quotation marks, brackets, and citations omitted]). The classification of any particular activity is dependent "on several considerations, including whether the activity was historically performed by government, whether it is best executed by government[,] and whether it is undertaken for profit or revenue" (Matter of Karedes v Colella, 100 NY2d 45, 50 [2003]; accord Bouchard v State of New York, 206 AD3d 1495, 1497 [3d Dept 2022]; Kochanski v City of New York, 76 AD3d 1050, 1051-1052 [2d Dept 2010]). Whether a specific action is governmental or proprietary is a question of law (see Bouchard, 206 AD3d at 1496).
To determine whether the government or the private sector has historically performed newborn screening for genetic conditions broadly and SMA specifically, the Court must first examine the history of the newborn screening program in New York. Public Health Law § 2500-a (1) requires "the administrative officer or other person in charge of each institution caring for infants [28] days or less of age . . . to cause to have administered to every such infant or child in its or [their] care a test for diseases and conditions designated by the commissioner." The first version of this statute was passed by the Legislature and signed into law in 1964. With its passage, New York became the second state, after Massachusetts, to establish a screening program. Initially, the statute only screened for phenylketonuria, "an inborn error of metabolism which occurs once in about 10,000 to 15,000 births and which, unless detected shortly after [*5]birth, will result in serious [developmental disabilities]" (Ten-Day Bill Budget Report, Bill Jacket, L 1964, ch 785, at 3). The legislation was projected to result in "long range savings" stemming from the early treatment of phenylketonuria by decreasing the burden on the State to care for those who could become wards of the State and allow for those infants to become "contributing members of society" (id. at 4). The Department of Health wrote a letter in support of the bill in which it noted "the bill does not carry an appropriation, it being apparently contemplated by the sponsors of the legislation that the cost of the program during the first fiscal year will be absorbed by the purchasers of medical care" (DOH Letter, id., 5). However, the letter proposed that "it would be more economical for the public to operate a central testing system" and pointed out that there were funds potentially available for that purpose (id.). Although the Court has not been able to determine the exact point in time that the Wadsworth Center started conducting testing, its website indicates that by 1975 its involvement with the newborn screening program was well-established—that year, screening staff from other states journeyed to the Center to learn how to screen for sickle cell disease (see Newborn Screening History/Timeline, https://wadsworth.org/programs/newborn/screening/history [accessed June 16, 2025]. By regulation, "screening . . . shall be performed by [the Wadsworth Center]" (see 10 NYCRR 69-1.1 [n]; 69-1.2 [b]).
SMA was first identified in the late 1800s; however, it was not known to be a genetic condition until the mid-1990s (see Hisahide Nishio et al., Spinal Muscular Atrophy: The Past, Present and Future of Diagnosis and Treatment, International Journal of Molecular Sciences Vol 24, Issue 15 [2023], available at https://pmc.ncbi.nlm.nih.gov/articles/PMC10418635/ [accessed June 16, 2025]. Prior to 2016, there were no drugs or treatments that could stop the progression of SMA and it was therefore considered incurable (see id.). That changed in 2016 when the first drug to treat SMA was approved by the Food and Drug Administration (FDA). A second drug was approved in 2019 and a third in 2020 (see id.). Because the drugs were most effective if they were started prior to the onset of symptoms, discovering SMA early became crucial to treating the condition (see id.). Between January 2016 and September 2018, New York State conducted a pilot study for screening SMA in newborns (see Bo Hoon Lee et al., Newborn Screening for Spinal Muscular Atrophy in New York State, Neurology Vol 99, Number 14 [2022], available at https://pmc.ncbi.nlm.nih.gov/articles/PMC9576300/ [accessed June 16, 2025]). Following that successful trial, the State added SMA to its newborn screening program on October 1, 2018 (see id.). In its announcement, the Wadsworth Center mentioned that, with the addition of SMA and other conditions added to the program on the same date, the State was screening for all of the conditions on the Secretary of Health and Human Services' Recommended Uniform Screening Panel (see Newborn Screening Program Adds Three More Disorders Beginning October 1, 2018, https://wadsworth.org/news/newborn-screening-program-adds-three-more-disorders-beginning-october-1-2018 [accessed June 16, 2025].
The extensive history of newborn screening in New York—dating back to 1965 when Public Health Law § 2500-a went into effect—demonstrates that this function has traditionally been performed by the State. The Wadsworth Center, on behalf of the State, has been responsible for conducting screenings as part of the program for over 50 years. Although the program started by just testing for phenylketonuria, the State has significantly expanded the program and proactively adds new tests when screening at birth becomes useful. This is particularly clear with respect to SMA. Prior to 2016, SMA was incurable and therefore there was no need to conduct genetic screening tests at birth. When the first drug for treating SMA [*6]was approved by the FDA in 2016, New York immediately began conducting a pilot study to add SMA to the screening program. Upon the pilot study's conclusion in September 2018, SMA was quicky added to the screening program that October.
Claimants have not provided the Court with any evidence that newborn screening—particularly taking samples from a child for testing at birth—has historically been performed by the private sector. Although other states often use private labs to support their testing operation, the screening programs themselves are uniformly state-operated. Therefore, the Court finds that newborn screening has historically been performed by the State.
The court next turns to whether this activity is best executed by the government. In general, where governmental employees perform medical care for specific individuals, that action is proprietary because the State is acting in the same capacity as a doctor in the private sector (see e.g. Andrews v County of Cayuga, 96 AD3d 1477, 1477-1478 [4th Dept 2012]; D'Avolio v Prado, 277 AD2d 877, 879 [4th Dept 2000]; Rattray v State of New York, 223 AD2d 356, 357 [1st Dept 1996]). However, emergency medical services are a governmental function; in Applewhite, the court determined that the Emergency Medical Technicians from New York City's Fire Department were acting in a governmental capacity even though private ambulance operators "provide[d] supplemental support for [this] critical governmental duty" (21 NY3d at 428).
Although not a medical treatment case, the Court finds Drever v State of New York (134 AD3d 19 [3d Dept 2015]) to be particularly instructive. There, the court determined that the Department of Motor Vehicles' operation of the Donate Life Registry was done in a governmental capacity, because "facilitating the identification of organ and tissue donors and the making of anatomical gifts through DMV applications and renewals" was done to "protect[] and promot[e] the health and welfare of the public through the exercise of its general police powers" (Drever, 134 AD3d at 24). Additionally, the court held that "[the] defendant is particularly well-suited to facilitate and encourage the enrollment of organ donors" (id. at 25). The court also held that the establishment of the Donate Life Registry was akin to other public health measures that were governmental in nature (see id. at 24) including the maintenance of a registry of childcare centers (see generally McLean v City of New York, 12 NY3d 194 [2009]) and operation of a lead poisoning prevention and treatment program (see generally Pelaez v Seide, 2 NY3d 186 [2004]).
The Court finds that the newborn screening program is best executed by the State. Only the State, through the application of its general police powers, could mandate screening for all newborns in the State. The program is unquestionably operated, like the Donate Life Registry, to "protect[] and promot[e] the health and welfare of the public" by identifying hidden conditions shortly after an infant's birth so that they can be effectively treated (Drever, 134 AD3d at 24; see Applewhite, 21 NY3d at 427-429). The private sector could not operate this type of program at this scale. Therefore, notwithstanding that medical treatment may be proprietary in an individual capacity, the operation of this state-wide program is best executed by defendant.
As for revenue, it is clear that where the government participates in an activity for profit, that activity is generally considered proprietary (see e.g. Karedes, 100 NY2d at 50-51; Bouchard, 206 AD3d at 1499-1500). In contrast, an activity that is performed for free or without profit-motive is generally considered governmental (see e.g. Applewhite, 21 NY3d at 429 [charging a fee to defray costs not inapposite to governmental function]; Drever, 134 AD3d at 25 [operating a program with no profit weighed in favor of governmental function]). The newborn [*7]screening program is operated free-of-charge and without any apparent profit motive. Therefore, there is no indication on this front that the government is acting in a proprietary capacity.
Taken together, the Court determines, as a matter of law, that the operation of the newborn screening program is governmental because it has historically been performed by the State, the State is in the best position to execute the program, and it is not undertaken for profit or revenue. This outcome also comports with the policy considerations set forth in Applewhite. As the Court of Appeals held there, "[t]he rationale underlying the government-function doctrine rests on several critical concerns: that the costs of tort recoveries would be excessively burdensome for taxpayers; the threat of liability could dissuade [governmental entities] from maintaining [vital] services; and extensive exposure to liability could consequently render . . . governments less, not more, effective in protecting their citizens" (Applewhite, 21 NY3d at 430). Here, defendant would face open-ended liability from the over 200,000 newborns that are tested through the program each year. There would be a substantial risk that this "unknown liability exposure" would be burdensome to taxpayers and could dissuade the State government from continuing to operate this free and beneficial program (id.). This Court "decline[s] to adopt a rule that has the potential to undermine" the effectiveness of the newborn screening program (id.).
B. Special Duty/Special Relationship
In order to find the State liable for negligence, the duty it breached "must be more than that owed the public generally" (Ferreira, 38 NY3d at 310 [internal quotation marks and citations omitted]). Arising from this principle, the special duty doctrine serves to "limit the class of citizens to whom the [State] owes a duty of protection" (id. [internal quotation marks and citation omitted]). There are three ways a special relationship may be established: "(1) the [claimant] belonged to a class for whose benefit a statute was enacted; (2) the government entity voluntarily assumed a duty to the [claimant] beyond what was owed to the public generally; or (3) the [State] took positive control of a known and dangerous safety condition" (Applewhite, 21 NY3d at 426). The claimant bears the burden of demonstrating the existence of a special duty (see id.).
The first type of special duty exists if the "governing statute . . . authorize[s] a private right of action" (McLean, 12 NY3d at 200 [internal quotation marks and citation omitted]). If the statute does not explicitly authorize a private right of action, one may be implied where "(1) the [claimant] is one of the class for whose particular benefit the statute was enacted; (2) recognition of a private right of action would promote the legislative purpose of the governing statute; and (3) to do so would be consistent with the legislative scheme" (id. [internal quotation marks and citation omitted]).
Defendant sufficiently argues, and claimants fail to rebut, that Public Health Law § 2500-a does not create an implied private right of action.[FN1]
 Unquestionably, A.H. was part of the class of people for whose benefit the statute was enacted. However, there is not any indication in the text of the statute, the statutory scheme as a whole, or in the legislative history that a private right of action would promote the legislative purpose of the statute or be consistent with the legislative scheme. Instead, the broader legislative scheme which the newborn screening program is part of provides the Commissioner with the authority to "establish [*8]minimum standards in accordance with established and accepted medical principles for local maternal and child health services" (Public Health Law § 2500 [2]), including to determine which tests to perform on a newborn's sample. Additionally, nothing within the statute's legislative history indicates that it was intended or even believed to create a private right of action. Therefore, the first type of special duty cannot be established (see T.T. v State of New York, 151 AD3d 1345, 1348-1349 [3d Dept 2017]; Signature Health Ctr., LLC v State of New York, 92 AD3d 11, 15 [3d Dept 2011], lv denied 19 NY3d 811 [2012]).
Turning to the second kind of special duty, to find that the government voluntarily assumed a special duty to the claimant beyond what is owed to the public generally, the claimant must establish the presence of four elements:
(1) an assumption by the [State], through promises or actions, of an affirmative duty to act on behalf of the party who was injured; (2) knowledge on the part of the [State]'s agents that inaction could lead to harm; (3) some form of direct contact between the [State]'s agents and the injured party; and (4) that party's justifiable reliance on the [State]'s affirmative undertaking
(Cuffy v City of New York, 69 NY2d 255, 260 [1987]; accord Applewhite, 21 NY3d at 430-431). Each element "must be present for a special duty to attach" (Maldovan v County of Erie, 39 NY3d 166, 172 [2022] [internal quotation marks and citation omitted], rearg denied 39 NY3d 1067 [2023]).
Defendant argues that claimants will be unable to prove the existence of a special duty on this ground because there is no evidence that any of defendant's agents assumed an affirmative duty to act on claimants' behalf, that those agents had direct contact with claimants, and that claimants justifiably relied on such an undertaking.[FN2]
 Specifically, defendant posits that there was no direct contact between it and claimants because the test results were conveyed to A.H.'s pediatrician, not to claimants themselves.
Here, although claimants received a brochure at the hospital, there is no evidence that any agent of defendant communicated with them at that time and the brochure itself indicates that test results will be conveyed to the pediatrician provided. Once the Wadsworth Center concluded its screening, the flawed results were sent to the pediatrician and contained a notice under the label "Attention Health Care Provider" that clearly indicated the results were meant to be received by a medical professional (Negative Report, Affirm in Supp of Mot, Exh D, 2).
The question therefore becomes whether direct contact may be established between claimants and defendant via A.H.'s pediatrician. In the Court's view, the physician-patient relationship, which "operates and flourishes in an atmosphere of transcendent trust and confidence and is infused with fiduciary obligations" (Aufrichtig v Lowell, 85 NY2d 540, 546 [1995]), could be viewed as the kind of close relationship that would permit claimants to establish direct contact through their relationship with the pediatrician. However, the Court of Appeals has clearly held that "direct contact and reliance by someone other than the [claimant is] sufficient to create a special relationship only where the person making the contact was acting on behalf of [their] immediate family" (Laratro v City of New York, 8 NY3d 79, 84 [2006] [*9][emphasis added]; accord Tara N.P., 28 NY3d at 715). Although this Court might decide otherwise were this an issue of first impression, the Court will not deviate from clear and established precedent. Therefore, because the pediatrician is not an immediate family member and there is no other evidence of direct contact between claimants and defendant, defendant has demonstrated that claimants will be unable to establish both direct contact and justifiable reliance (see Tara N.P., 28 NY3d at 715 ["(I)n the absence of direct contact between [the claimant] and [the defendant], the critical element of justifiable reliance cannot be met" (internal quotation marks and citation omitted)]; see also Lauer v City of New York, 95 NY2d 95, 102-103 [2000]; Etienne v New York City Police Dept., 37 AD3d 647, 649 [2d Dept 2007]).
Accordingly, the burden shifts to claimants to raise a triable issue of fact. In response, claimants attempt to argue that there was direct contact with claimants through the brochure they were given and through the pediatrician. As previously discussed, this contact is insufficient. Claimants have not proven that they or any immediate family member had direct contact with defendant's agents. The unnamed hospital staffer who gave them the brochure and their pediatrician are insufficient to create such a link between them and the State. Therefore, claimants will be unable to prove the second type of special duty.
Finally, the third type of special duty only exists in "rare circumstances" (Sutton v City of New York, 119 AD3d 851, 852 [2d Dept 2014], lv denied 24 NY3d 918 [2015]) and requires that the State "take[] positive control of a known and dangerous safety condition" (Ferreira, 38 NY3d at 317; see Smullen v City of New York, 28 NY2d 66, 72-73 [1971]). The State "must 'affirmatively act to place the [claimant] in harm's way,' through words or conduct that 'induce the [claimant] to embark on a dangerous course [they] would otherwise have avoided" (Szydlowski v Town of Bethlehem, 162 AD3d 1188, 1190 [3d Dept 2018] [internal brackets and emphasis omitted], quoting Abraham v City of New York, 39 AD3d 21, 28 [2d Dept 2007], lv denied 10 NY3d 707 [2008]; see Ferreira, 38 NY3d at 317; Sutton, 119 AD3d at 852-853).
Here, defendant has demonstrated that there is no evidence that the State took positive direction and control over a known and dangerous safety condition and claimants have failed to rebut this showing with triable issues of fact. The undisputed evidence shows that the false negative on A.H.'s screening results was caused by an unintentional transcription error. No one at the Wadsworth Center was aware that a mistake had been made and therefore could not have affirmatively acted to put A.H. in harm's way. In the absence of any evidence that defendant's agents took positive control over the situation or that the situation was even known to them, claimants cannot establish the third type of special duty (see Sutton, 119 AD3d at, 852-853; Lewis v State of New York, 68 AD3d 1513, 1515 [3d Dept 2009]; Battaglia v Town of Bethlehem, 46 AD3d 1151, 1153-1154 [3d Dept 2007]).
In summary, defendant has demonstrated its entitlement to summary judgment by showing that claimants will be unable to prove all three kinds of special duty. In response, claimants have not presented a material issue of fact sufficient to rebut defendant's showing. Therefore, defendant's cross-motion for summary judgment is granted.

CONCLUSION

Based upon the foregoing, defendant's cross-motion for summary judgment to dismiss the claim is granted and claimants' motion to strike defendant's affirmative defenses is denied as academic. Accordingly, claim No. 137291 is DISMISSED. This constitutes the Decision and Order of this Court.
Saratoga Springs, New York
June 16, 2025
FRANCISCO CALDERON
Judge of the Court of Claims
The following papers were read and considered by the Court:
1. Claimants' Notice of Motion, Attorney's Affirmation in Support of Motion and Memorandum of Law, and Exhibits/Attachments;
2. Defendant's Notice of Cross-Motion, Attorney's Affirmation in Opposition to Motion and in Support of Cross-Motion, and Exhibits;
3. Claimants' Reply Affirmation in Support of Motion and Opposition to Cross-Motion, and Attachment;
4. Letters from Claimant's Counsel and Assistant Attorney General (NYSCEF Docs. 44-46).

Footnotes

Footnote 1: Neither party argues that the statute expressly creates a private right of action.

Footnote 2: Defendant does not argue, at this juncture, that there is an absence of material issues of fact with respect to the agent's knowledge that inaction could lead to harm.